715 A.2d 1068

PENNSYLVANIA NATIONAL MUTUAL CASUALTY IN-
SURANCE CO., City of Harrisburg and Harrisburg
Redevelopment Authority, Appellants,

v.

DEPARTMENT OF LABOR AND INDUSTRY, PREVAILING
WAGE APPEALS BOARD, Appellee.

Pennsylvania State Building and Construction Trades
Council, AFL–CIO and Central Pennsylvania
Building Trades Council, Intervenors.

DEPARTMENT OF LABOR AND INDUSTRY,
PREVAILING WAGE DIVISION

v.

PENNSYLVANIA PREVAILING WAGE
APPEALS BOARD, Appellee.

Pennsylvania State Building and Construction Trades
Council, AFL–CIO and Central Pennsylvania
Trades Council, Intervenors.

Appeal of PA NATIONAL MUTUAL CASUALTY INS. CO., City
of Harrisburg and Harrisburg Redevelopment Authority.

Supreme Court of Pennsylvania.

Submitted March 27, 1997.

Decided July 7, 1998.

Eric N. Athey, Lancaster, Diane M. Tokarsky, Harrisburg, for PA Nat. Mut. Cas. Ins.

Judith B. Schimmel, Harrisburg, for City of Harrisburg.

Stuart J. Magdule, Hummelstown, for Harrisburg Redevelopment Authority.

Frayda Kamber, Deputy Chief Counsel, for Prevailing Wage Appeals Bd.

Irwin W. Aronson, John T. Kupchinsky, Camp Hill, for intervenors PA State Bldg., et al.

Richard C. Lengler, Harrisburg, for Prevailing Wage Div.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO and SAYLOR, JJ.

## OPINION OF THE COURT

CAPPY, Justice.

Appellants, Pennsylvania National Mutual Casualty Insurance Co. ("PNI"), the City of Harrisburg (the "City"), and the Harrisburg Redevelopment Authority (the "HRA"), appeal from the order of the Commonwealth Court affirming a determination by the Pennsylvania Prevailing Wage Appeals Board (the "Board") that the Prevailing Wage Act[1] (the "Act") applies to the construction of PNI's new headquarters in Harrisburg, Pennsylvania. For the reasons that follow, we affirm in part and reverse in part the decision of the Commonwealth Court.

PNI, a Pennsylvania mutual insurance company, is presently headquartered in the city of Harrisburg. PNI determined that its present headquarters was no longer adequate. In an effort to keep PNI from moving to a suburban location, the City and the HRA entered into a Development Agreement with PNI, dated January 24, 1994, to facilitate preparation of a building site for the eventual construction of a new headquarters on Market and North Second Street. Aspects of the

---

1. 43 P.S. §§ 165–1—165–17.

building project included site acquisition, asbestos removal, demolition, and other site preparation, as well as the subsequent construction of an office tower and a parking garage.

Existing properties on the site were acquired by the City, in part, through a $1.5 million Economic Development Partnership Grant. Additionally, as part of the site preparation, the Development Agreement provided for the City to ready the site for construction by contracting to have asbestos removed from existing structures,. On September 24, 1994, the City entered into a $109,000 asbestos removal contract with CMC Environmental Hazard Abatement, Inc. ("CMC"). The asbestos agreement lists the City and the HRA as fee simple owners of the site properties and provides for payment by the City to CMC for performance of the asbestos removal, although ultimately, pursuant to the Development Agreement, the asbestos removal will be at the expense of PNI. Finally, the City entered into an agreement with a demolition contractor to perform site preparation work other than the asbestos removal.

Pursuant to the Development Agreement, immediately upon completion of demolition of existing structures on the site, the City and the HRA will convey the site properties to PNI, or its wholly-owned subsidiary, Pennsylvania National Realty Trust ("PNRT"). After construction, the building will be owned by PNRT and leased to PNI.

Construction of the PNI headquarters is being financed, in whole or in part, through the arrangements made with various public entities, including the City, the HRA, the Harrisburg School District, the County of Dauphin, and the Pennsylvania Department of Commerce under the Tax Increment Financing Act, 53 P.S. §§ 6930.1–6930.13, the Urban Redevelopment Law, 35 P.S. § 1701, et seq., and the Housing and Redevelopment Assistance Law, 35 P.S. §§ 1661–1676. The total cost of the headquarters will exceed $30,000,000.

By letter dated September 9, 1994, the Prevailing Wage Division of the Pennsylvania Department of Labor and Indus-

try (the "Division") [2] issued a determination which concluded that the PNI building project, in its entirety, was not subject to the Act. On September 13, 1994, the Pennsylvania State Building and Construction Trades Council, AFL–CIO and the Central Pennsylvania Building Trades Council (the "Unions"), which are councils of labor unions representing employees in the building and construction industry throughout Pennsylvania and central Pennsylvania, respectively, filed a grievance with the Board, pursuant to 43 P.S. § 165–2.2(e)(1) of the Act, regarding the Division's determination.

After consideration of a joint request for expedited relief, the Board, by order dated October 18, 1994, *inter alia*, set a briefing schedule, and ordered that the parties address the issue of whether the Unions had standing to challenge the Division's determination in this case. Subsequently, PNI, the City and the HRA intervened in the grievance proceedings in support of the Division's position. Although the parties could not agree on stipulated facts, an evidentiary hearing was not held; only documentary evidence was presented for the Board's consideration. The Board heard oral argument on November 3, 1994 and rendered a decision and order on January 13, 1995.

In its unanimous decision reversing the Division's determination, the Board concluded that the Unions had standing to file their grievances and that because the asbestos removal constituted "public work" as defined in the Act, the Act applies to the entire PNI building project. Appellants appealed this determination and the Division filed a separate appeal of the Board's order. The Commonwealth Court consolidated the appeals, and affirmed the Board's order. We granted allocatur limited to three issues.

The threshold issue before this court is whether the Unions had standing to file a grievance in this case. Assuming the Unions have standing, the second issue is whether the Act applies to the entire building project because public bodies

2. The Division, which is the Commonwealth agency charged with administering and enforcing the Act, is now known as the "Bureau of Labor Law Compliance." However, for purposes of this opinion, its designation shall remain the "Division."

initially paid for the asbestos removal project. Finally, we granted allocatur to determine whether the Act applies to the entire building project because it is financed under the Tax Increment Financing Act, the Urban Redevelopment Act, or the Housing and Redevelopment Assistance Law.[3]

The initial question in this case is whether the Unions have standing to file a grievance with the Board.[4] In order to bring an action, the grievant must be an entity which the law recognizes as an appropriate party to do so. Thus, as a general proposition, the concept of "standing" is concerned only with the question of who is entitled to make a legal challenge to the matter involved. *Pennsylvania Game Commission v. Department of Environmental Resources*, 521 Pa. 121, 555 A.2d 812 (1989). Standing may be conferred by statute or by having an interest deserving of legal protection. We will first address whether under the Act, and the regulations promulgated thereunder, the Unions in this matter have standing to file a grievance.

In this case, the Unions filed their grievance under section 2.2(e) of the Act.[5] 43 P.S. § 165–2.2(e). Section 2.2(e) of the Act states:

§ 165–2.2 Appeals Board, powers and duties.

(e) The Appeals Board shall have the power and duty to—

3. Our standard of review is limited to determining whether the Board's findings are supported by substantial evidence, whether an error of law was committed, or whether any constitutional rights were violated. 2 Pa.C.S. § 704.

4. Neither the Division nor the Appellants initially challenged the Unions' standing before the Board. Rather, the Board, *sua sponte*, ordered the parties to address the standing issue. In their brief to this court, the Unions contend that the standing issue should not be considered because the Board improperly raised the standing issue on its own initiative. Whether this contention is meritorious is of no moment as the Unions failed to raise the issue of the Board's authority to bring standing into question before the Board; thus, the Unions have waived their opportunity to contest the Board's action in this case.

5. The Commonwealth Court mistakenly determined that section 8 alone conferred standing upon the Unions to challenge the Division's determination that the project is not covered by the Act. 43 P.S. § 165–8. Section 8 relates to a challenge to a rate determination. The matter *sub judice* is a grievance regarding applicability of the Act filed pursu-

(1) hear and determine any grievance or appeal arising out of the administration of this act.

(2) promulgate rules and regulations necessary to carry out the duties placed upon the board by this act. . . .

Likewise, the related regulations are found at 34 Pa.Code § 213.8. Section 213–8 of the Code provides:

§ 213–8. Grievances arising from administration of the act.
(a) Under section 2.2(e) of the act (43 P.S. § 165–2.2(e)), the Board will hear and determine grievances arising out of the administration of the act. Appeals from determinations of the Secretary are excluded from review under this section. The types of disputes heard under this section shall include the following:

(1) Disputes as to the applicability of the act to a project. . . .

Thus, pursuant to this statute, the General Assembly has empowered the Board to hear and determine any grievances concerning the applicability of the Act to a particular project and to promulgate rules and regulations regarding such grievances.

The rules and regulations promulgated by the Board do not specifically define who may file a grievance. The Code's definition of "grievant" under section 213.2 merely refers to a "party." [6] The definition of who is a proper "party" lists a grievant, the agency and intervenors. [7] Finally, the Board's

ant to section 2.2(e). Moreover, even if § 165–8 were applicable, that section, unlike section 2.2(e), limits who may bring rate challenges to, *inter alia*, representatives of "workmen." The Act defines "workmen" as certain specific classes of workers "engaged in the performance of services directly upon the public work project. . . ." 43 P.S. § 165–2(7). Since the Unions represent no persons employed on the PNI building project, they would appear to have no standing to file a petition regarding rates pursuant to § 165–8. Thus, we conclude that the Commonwealth Court's finding of standing based solely upon section 8 was in error.

**6.** "Grievant" is defined as "A party filing a grievance under section 2.2(e)(1) of the act, with the Board." 34 Pa.Code § 213.2

**7.** "Party" is defined in relevant part as "[i]n grievance proceedings under §213.8 (relating to grievances arising from administration of the act) the grievant, the agency and intervenors." 34 Pa.Code § 213.2.

procedural rules imply that a grievant under section 2.2(e) must have at least some interest in the controversy, as the rules require the grievant to include its interest in its notice of grievance. 34 Pa.Code § 213.8(b)(1). Thus, the Act and Code fail to give a specific definition of who is a proper grievant to challenge applicability of the Act.

It is axiomatic that the object of statutory interpretation is to ascertain and effectuate the intention of the General Assembly. 1 Pa.C.S.A. § 1921(a). Since the Act does not specifically set forth which entities have standing to file a grievance in this matter, we must ascertain the intent of the legislature by other means. In doing so, we will look to the Act, viewed as a whole, and the underlying policies to be served by the Act. 1 Pa.C.S.A. § 1921(c)(3), (4) and (6)(intent of General Assembly may be ascertained by considering, among other matters, the mischief to be remedied, the object to be obtained, and the consequences of a particular interpretation).

Viewing the Act as a whole, and the regulations promulgated thereunder, there is evidenced a legislative intent that unions are to play an integral role in the administration and the enforcement of the Act.

Specifically, Section 2.1 of the Act mandates that of the seven member Advisory Board, one shall be a member of an historically established union representing labor in the building construction industry and one shall be a member of an historically established union representing labor in the heavy and highway construction industry. Likewise, Section 2.2 of the Act requires that of the seven member Appeals Board, one must be a member of an historically established union representing labor in the building construction industry and one must be a member of an historically established union representing labor in the heavy and highway construction industry. Section 7 of the Act requires the Secretary to determine prevailing wage rates by locality. Regulations relating thereto note that the Secretary specifically encourages input from labor organizations in establishing general prevailing wage rates. 34 Pa.Code § 9.105(c)(3). Additionally, pursuant to

section 7, the Secretary is required to give notice of such determinations to any representative of any craft who requests them. Finally, section 8 of the Act expressly recognizes, *inter alia,* any representative of any craft or classification of workmen as a proper party to file with the Secretary a petition challenging its determination of wage rates, and the Secretary must notify the collective bargaining representative of its investigation of any wage rate challenge. Thus, the Act, when viewed as a whole, embraces unions as appropriate parties to take an active role in the administration and the enforcement of the Act.

Turning to the public policies advanced by the Act, the primary underlying policy of the Act is to protect workmen employed on public work projects from substandard pay by ensuring that they receive prevailing minimum wage. *Kulzer Roofing, Inc. v. Department of Labor and Industry and Bristol Township School District,* 68 Pa.Cmwlth. 642, 450 A.2d 259 (1982). We believe, as did the Board, that in order to protect workmen "it is essential that some workers and unions who are not working under the protections of the Act, must have standing to challenge a determination in which the Division finds that the Act does not apply." (Board Final Decision at p. 6) This is so because issues such as the one before us would be likely to escape appellate review because those more directly and immediately affected by the complained of conduct are beneficially affected as opposed to adversely affected. *Accord In re Application of Biester,* 487 Pa. 438, 409 A.2d 848 (1979). As the Board cogently noted, appellate review of the Division's finding that the Act is not applicable would be foreclosed because no viable entity could or would contest the Division's position. A public body, seeking to save funds, would not be likely to complain. Nor would the contractor, or those individuals hired to work, even if at lower than prevailing rates, be likely to object. Additionally, the policy advanced by the Act makes standing appropriate because "unemployed workers, who would be 'workmen' on the Project if it were covered, would have no vehicle for challenging such a decision or for protecting the lawful right

to perform prevailing wage work. Neither individuals nor their collective bargaining representatives would have recourse to a remedy." (Board Final Decision at p. 6). Thus, the public policy advanced by the Act points to allowing unions to file grievances regarding determinations of applicability of the Act.

In reaching a conclusion regarding the intent of the General Assembly we are guided by that fact that section 2.2(e) of the Act, and the regulations promulgated thereunder, place no limitation on standing to file a grievance. Likewise, notably absent from section 2.2(e) or from the Code's definition of "grievant" is any limitation similar to that found in section 8 of the Act which requires that a union grievant must represent an individual on the public work. Additionally, the Act, when read as a whole, specifically recognizes unions as active participants in the administration and enforcement of the Act. Finally, we agree with the Board that the public policies advanced by the Act will be better served by interpreting the Act to allow unions standing. Therefore, we believe that the General Assembly intended union grievants, other than those whose members include persons directly involved on public work, to have standing to file grievances regarding application of the Act to a particular project. We conclude that the Unions have standing to file their grievances in this matter.[8]

Having determined that the Unions have standing, we turn to the second issue on which we granted allocatur, i.e., whether the Act applies to the entire PNI building project because public bodies initially paid for the asbestos removal portion of

8. We note that the Division, as the party against whom the grievance was filed, does not challenge the Unions' standing in this matter. It is only the intervenors/Appellants who object to the Unions' standing to grieve the Division's determination regarding application of the Act. We recognize that judicial deference is to be given to interpretations of statutes by those charged with the administration and enforcement of such laws and believe that such deference is appropriate with regard to standing in this case. *Accord Alpha Auto Sales, Inc. v. Department of State, Bureau of Professional and Occupational Affairs*, 537 Pa. 353, 357, 644 A.2d 153, 155 (1994).

site preparation. A review of the Act's requirements and its definition of "public work" is required to resolve this issue.

43 P.S. § 165–5 of the Act requires that:

Not less than the prevailing minimum wages as determined hereunder shall be paid to all workmen employed on public work.

Thus, only workmen who labor on "public work" must be paid the minimum prevailing wage. Section 2(5) of the Act, 43 P.S. § 165–2(5), defines "public work" as:

Construction, reconstruction, demolition, alteration and/or repair work other than maintenance work, done under contract and paid for in whole or in part out of the funds of a public body where the estimated cost of the total project is in excess of twenty-five thousand dollars ($25,000), but shall not include work performed under a rehabilitation or manpower training program.

Therefore, we must look at the work performed on the PNI building project to determine whether it is deemed to constitute "public work," and, thus, subject to the Act. Initially, we note, as did the Board, that the fact pattern before us is unique. The circumscribed role of the City in the building project was to prepare and deliver vacant land. Once the City completed its contracts for asbestos removal and demolition, and conveyed the property to PNI, its limited involvement in the development of the property ceased altogether. The City will evidently not be a party to any post-conveyance construction contract. Other than possible state financing addressed in issue three below, no post-conveyance construction contracts will be paid for in whole or in part with public funds. Thus, the factual scenario before us is unlike other situations in which a public body contracts for work which is to be paid for entirely with public monies.

■ Again, to constitute "public work" four elements must be satisfied:

(1) there must be certain work;

(2) such work must be under contract;

(3) such work must be paid for in whole or in part with public funds; and

(4) the estimated cost of the total project must be in excess of $25,000.

Under the facts of this case, the lower tribunals found that the $109,000.00 asbestos removal work met this definition. The asbestos removal was the kind of work covered by the Act, i.e., demolition work, it was under contract, and as determined by the lower tribunals, was paid for in whole or in part out of the funds of a public body. The $25,000 threshold was clearly met. The lower tribunals then found that because the asbestos removal constituted public work, the entire PNI building project, i.e., the remaining work, constituted public work for purposes of the Act.

While the remaining work is construction work, and is done under contract, the construction work is not paid for in whole or in part from the funds of a public body. Thus, failing the third element necessary to constitute "public work," the remaining construction work does not meet the definition of "public work," and, thus, is not covered by the Act.

The Board and Commonwealth Court found that the asbestos removal work constituted public work which triggered coverage of the Act for the entire PNI building project. Specifically, the Board found, and the Unions here argue, that the Act speaks to the "total project," and not individual contracts or phases, and establishes coverage where *any* work is public work. Thus, the Board looked at the whole project as a comprehensive undertaking.[9]

■ We do not agree with the Board's interpretation of the definition of "public work." Assuming, arguendo, that the "total project" is the $30 million PNI building project, the term "total project," is referred to in the definition of "public work" only in the context of establishing a monetary threshold

9. While the Commonwealth Court opinion dealt almost exclusively with the issue of whether the asbestos removal was covered by the Act, the Commonwealth Court also concluded, without analysis, that since asbestos removal was covered by the Act, then the total project was likewise covered under the Act.

which excludes from coverage of the Act, projects costing less than $25,000. We do not interpret this prong to confer public work status to work which otherwise fails to satisfy the other three elements of the definition of "public work." Rather, all elements of the definition must be satisfied for work to constitute "public work."

Nothing in section 5 of the Act mandates that an entire construction project be covered by the Act. On the contrary, section 5 is a limited requirement that workmen be paid prevailing wage only on "public work." The legislature could have crafted the definition of "public work" to include work that was not paid for in whole or in part with funds of a public body, but instead it chose to limit prevailing wage to be paid only on that work which satisfies the four element definition of "public work." Based upon the admittedly unique facts described above, we believe that while the Board and Commonwealth Court correctly found that the asbestos removal was public work, the construction work did not constitute public work as that term is defined in the Act. Therefore, the provisions of the Act were not applicable to such work.[10]

**10.** The Unions rely upon *Pennsylvania Prevailing Wage Appeals Board v. Steve Black,* 27 Pa.Cmwlth. 21, 365 A.2d 685 (1976) in support of their argument. We believe that reliance upon *Steve Black* is simply misplaced. In *Steve Black,* Steve Black, Inc., a contractor was found to have intentionally violated the Act by failing to pay its employees the prevailing minimum wage. On appeal before the Commonwealth Court, Steve Black argued, *inter alia,* that as the Act did not apply to contracts on public works where the contract price was less than $25,000, and Steve Black's contract price was $22,731, the Act was inapplicable. The Commonwealth Court properly rejected this argument, noting that the terms of the Act indicate that it applies to all contracts involved in a public works project where the estimated total cost of the entire project exceeded $25,000. Thus, as the total cost of the public school project was $450,000, Steve Black's contract was within the purview of the Act.

While the principle stated in *Steve Black* is valid, it is simply inapplicable to, and distinguishable from, this matter. In *Steve Black,* there was no question that the contractor was being engaged by a public body to perform work, under contract, which would be paid for with public funds. Moreover, in *Steve Black,* the specifications for the project expressly provided that the Act would apply to all contracts for the project. Here, the issue is whether the work, which is not paid for with funds of a public body, is public work within the definition of the Act.

As we find that under the distinct facts of this case the entire PNI building project is not covered by the Act simply because asbestos removal was deemed to be public work, we are required to address the third issue on which allocatur was granted regarding whether certain statutory financing arrangements triggered coverage under the Act.

Neither the Board nor the Commonwealth Court addressed the financing issue. As noted above, the Board did not hold an evidentiary hearing but merely accepted documentary evidence.[11] Moreover, neither tribunal addressed the legal issues of whether financing under these statutory provisions would implicate the Act.

Based upon the above, we believe that at a minimum, a detailed factual foundation is a necessary predicate to resolving this complex issue which will have an enormous impact on construction projects throughout our Commonwealth. Therefore, we remand this case to the Board to hold further proceedings an evidentiary hearing and to make specific findings of fact and conclusions of law regarding whether the Act applies to the entire PNI building project because it is financed under the Tax Increment Financing Act, the Urban Redevelopment Act, and/or the Housing and Redevelopment Assistance Law.

As we find that the Unions have standing but that the Act does not apply to the entire PNI building project based solely upon the Commonwealth Court's correct conclusion that the

Thus, the legal issues raised and the facts presented in *Steve Black* are significantly different from those presently before this court.

**11.** Specifically, no detailed findings of fact were made by the Board as to, *inter alia,* funding streams; what specific entities utilized tax monies and grants; for what specific work the tax and grant monies were used; the process through which tax increment bonds were issued and what role if any public entities played in the issuance of the bonds; what entities retained the proceeds of the bonds; what purpose interest income generated from the bonds is used for; what entities are ultimately responsible for payment of the bonds and debt service on the same; whether a public entity's credit was pledged in connection with the bonds; whether tax monies were merely foregone or whether these monies were actually collected by public entities and redistributed; and whether the public entity has access to such monies.

Act applies to the asbestos removal work, we affirm in part, albeit for different reasons, and reverse in part, the decision of the Commonwealth Court.[12] For the reasons set forth herein, we remand this matter to the Board for further proceedings consistent with this opinion regarding the third issue on which we granted allocatur. Jurisdiction relinquished.

NEWMAN, J., did not participate in the consideration or decision of this matter.

FLAHERTY, C.J., concurs in the result.

12. The Supreme Court may affirm the decision of any inferior court on any ground, without regard to the grounds on which the court below relied. *E.J. McAleer & Co. v. Iceland Products, Inc.*, 475 Pa. 610, 613 n. 4, 381 A.2d 441, 443 n. 4 (1977).