*383 VENTERS, J.,
DISSENTING:
I respectfully disagree with the majority’s conclusion that the Attorney General has standing to assert the claim his office presents in the absence of affected universities. The majority has no express constitutional or direct statutory authority to support its conclusion - that the Attorney General has standing to sue the chief executive to enjoin an executive action, and so it bases its opinion on the vague notion that such authority was available to attorneys general at common law. As explained below, that notion is flat-out wrong. No attorney general in the entire common law history ever had that authority, and neither the majority opinion ñor the Attorney General himself cites even a single common law precedent for such power.
I agree with the majority’s conclusion that Representatives Wayne, Owens, and Marzian have no standing, either personally or as proxies for the legislative branch of government, to assert claims contesting the Governor’s executive order to reduce allotments to state-supported universities for the final quarter of the 2015-2016 fiscal year.[21] I join Justice Wright’s dissent and I agree with his reasoning that the affected state universities are the proper parties to bring the claim. Since the only affected parties with a claim to assert have reached an accommodation with the Governor and chosen not to litigate, there is no justicia-ble controversy. The only correct resolution is dismissal of the case without addressing the merits. Lawson v. Office of Attorney General, 415 S.W.3d 59, 67 (Ky.2013); Rose v. Council for Better Education, 790 S.W.2d 186 (Ky.1989); Ky. Const. § 112.
The doctrines of standing and justiciability prevent interlopers' from asserting claims that legally belong to others. The doctrines exists because we learned long ago in the common law tradition that it is unwise for the courts to litigate claims asserted by those who have no personal interest at stake. That is especially true when those who actually have a cognizable claim have declined to do so. To have standing to sue, “[a] plaintiff must-have a real, direct, present and substantial right or interest in- the subject matter' of the controversy.” Housing Authority of Louisville v. Service Employees International Union Local 557, 885 S.W.2d 692, 695 (Ky.1994). “In order to have standing to sue, a plaintiff need only have a real and substantial interest in the subject matter of the litigation, as opposed to a mere expectancy.” Bose, 790 S.W.2d at 202. To restate the standing concept in more colloquial terms: to have standing to assert a claim in court, “you have to have skin in the game.”
Standing to invoke the authority of the courts for redress of an.injury is. acquired in two, and only two, ways. First, as noted above, one who suffers a direct and immediate judicially-cognizable injury or has an interest deserving of legal protection has standing. Second, the legislature may by statute confer standing upon an entity even if it lacks a direct and immediate injury. See Tax Ease Lien Investments 1, LLC v. Commonwealth Bank & Trust, 384 *384 S.W.3d 141, 143 (Ky.2012) (quoting City of Ashland v. Ashland F.O.P. # 3, Inc., 888 S.W.2d 667, 668 (Ky.1994)); In re Pappas Senate Committee, 488 N.W.2d 795, 797 (Minn.1992); and Pennsylvania National Mutual Casualty Insurance Co. v. PWAB, 552 Pa. 385, 715 A.2d 1068, 1071 (1998).
The majority first relies upon our decision in Commonwealth ex rel. Conway v. Thompson, 300 S.W.3d 152 (Ky.2009), as a source for the Attorney General’s claim of standing in this matter. In Thompson we recognized that the attorney general has standing to seek injunctive relief on behalf of the citizens to prevent the early release of inmates from prison in derogation of the judicially-imposed sentences. Id. at 172. Implicit in that holding was our recognition that every single sentence affected by the planned prisoner release arose from a case in which the Commonwealth of Kentucky was an actual party, and in many instances, was actually represented by the Office of the Attorney General. Because the objective of that litigation fell squarely and indisputably within the criminal law enforcement interest and duties of the attorney general, we concluded that Attorney General Conway had “a sufficient personal right in these types of cases by virtue of the office and the duties commensurate with that high office.” Id. at 173 (emphasis added).
However, as the majority expressly acknowledges, the claim pressed by Attorney General Beshear in this litigation is not one of those “type of cases.” The claim now asserted falls far beyond the range of the Attorney General’s criminal law enforcement function. The Thompson case provides no support for the Attorney General’s stance in this case. The majority then looks to find other law supporting the Attorney General’s standing in this “type of case,” and naturally begins with Section 91 of the Kentucky Constitution.
Section 91 simply provides that the attorney general has whatever “duties and responsibilities” have been “prescribed by law.” The Attorney General, therefore, has no constitutionally-ordained authority that confers standing to enjoin the Governor, the Treasurer, or others from implementing the budget reduction plan for the state universities. Section 91 supports only the specific duties that have been “prescribed by law.” Consequently, we look to the relevant statutes enacted by the General Assembly addressing the matter. '
No statute expressly provides or even obliquely suggests that the Attorney General has the authority to sue the Governor to enjoin any executive action. The only statute that is even conceivably applicable is the generic provision of KRS § 15.020 that provides the Attorney General with the obligation to “exercise all common law duties and authority pertaining to the office ... under the common law, except where modified by statutory enactment.” The whole case boils down to whether “under common law” an attorney general had the authority to sue the chief executive for perceived violations of the law.
The majority readily acknowledges that “defining the Attorney General’s common law duties is not easily done” and I agree. But we need not define all the common law duties of an attorney general to sustain Attorney General Beshear’s claim of standing; rather, we need only find one common law duty that authorizes the suit he now asserts. I respectfully submit there are none to be found because at common law, suing the executive in the civil courts is simply not what attorneys general were empowered to do. See Natl Ass’n of Att’ys Gen., State Attorneys General Powers and Responsibilities 31 (Emily Myers, ed., 3d ed. 2013) (quoting Edwards, The Law Offices of the Crown 27 (1964)).
*385 In its search to find common law precedent for the unprecedented, the majority looks to Commonwealth of Kentucky ex rel. Hancock v. Paxton, 516 S.W.2d 865 (Ky.1974), which held that an attorney general has standing to initiate a lawsuit to ascertain the constitutionality of a state statute.[22] But that is not the question before this Court. Attorney General Beshear does not challenge the constitutionality of any statute.
The salient fact of the Paxton case is that Attorney General Ed Hancock never challenged to any degree the legality of -an executive action or executive authority despite naming as nominal parties the Department of Transportation and its commissioner. Although the Paxton decision does not cite a common law precedent allowing an attorney general to challenge the constitutionality of a statute, the existence of such a precedent would not be surprising given the well-documented legal battles, some of which involved actual armed warfare, waged over the centuries between the English monarch and the English parliament. In any event, Paxton’s lack of common law precedent allowing the attorney general to challenge the constitutionality of a statute does not logically indicate the existence of a power at common law to sue the executive to enjoin executive action.
The Paxton court offers up a weak rationalization for the existence of such power and it is based upon a flawed depiction of American political theory which the majority adopts. Paxton opines that since the attorneys general under the common law of England served the king and therefore lacked the authority to sue the sovereign, attorneys general in the democracies of the -American states in which “the people are king” serve the people, and therefore are not so constrained. That exercise of logic ignores the core of American constitutional theory: the people, as an exercise of their natural sovereignty, collectively acted to “institute” a government “of the people, by the people, for the people,” and thus by the constitutional' process they transferred their sovereignty to the state they created. The king is not sovereign in America, but neither are the people king.[23]
A more obvious contradiction to the Paxton theory is the undeniable fact that the people of Kentucky, the “king” as Pax-ton would have it, have NEVER directly or through their chosen representatives in the General Assembly granted the Attorney General the power he now asserts. There was no common law precedent for an attorney general suing the head of state when the state was a royal monarchy and the creation of the American states did not manufacture such precedent.[24]
Attorney General Beshear does not challenge the constitutionality of any state statute. Instead, he does what no attorney general at common law ever had the authority to do: he seeks a court order to enjoin an action of the state’s chief executive, the Governor, and the state’s treasurer; finance secretary, and budget director. The Attorney General deserves credit for earnestly undertaking a difficult issue that *386 he deeply regards as important and meritorious. I certainly do not suggest that executive authority should not be challenged. For a nation and a state founded upon principles of individual liberties, challenging the chief executive’s authority can be a good thing. However, the question before us is not whether the Governor’s action should be challenged; the question is whether the Attorney General has the authority to litigate the budget reduction issue by seeking to enjoin the Governor and the other executive officers. By the majority’s analysis, the Attorney General’s only viable claim to standing is that he is exercising a prerogative held by attorneys general at common law. The inconvenient fact is that no attorney general at common law ever had the authority to challenge the executive.
The majority also cites Johnson v. Commonwealth ex rel. Meredith, 291 Ky. 829, 165 S.W.2d 820 (1942), as supporting the Attorney General’s standing. Although Johnson lends interesting historical context to the issue at hand, it is ultimately inconsequential for two reasons. First, in Johnson as in Paxton, the Attorney General challenged the constitutionality of a statute rather than seeking to enjoin an executive action. Even more significant, however, is the fact that the Attorney General in Johnson had direct, conventional standing because he was directly injured by the statute being challenged. The statute he challenged expressly “divest[ed] the Attorney General of a major portion of his powers and prerogatives” so as to render the office “inoperative.” Id. at 824. Thus, the Attorney General’s standing in Johnson was in no way dependent upon the powers and duties of attorneys general at common law. Here, the challenged governmental action has no direct effect upon the Attorney General or his office that confers standing in the traditional sense. His only source of standing is statutory, specifically KRS § 15.020, which requires a common law precedent, and that precedent simply does not exist.
In Commonwealth ex rel. Ferguson v. Gardner, 327 S.W.2d 947, 948 (Ky.1959), Attorney General Ferguson sought to intervene in a civil action on behalf of a charitable trust. Like the current Attorney General in this case, Attorney General Ferguson had no direct or immediate interest in the controversy to confer standing, and in the absence of direct statutory authority, he claimed the common law power to intervene “predicated on the ancient English doctrine that the King, as parens patriae, superintended the administration of charities and acted by the attorney general, who was his proper officer in that respect.” The Court rejected that claim because “the Attorney General ... failed to show that there was any established and recognized law of England to the effect prior to 1607” allowing his office to assert a claim in that kind of litigation. Id. at 949.[25]
Several available sources of legal scholarship trace the common law history of the office of attorney general and the development of its powers and duties. See Comm. on the Office of Att’y Gen., Natl Ass’n of Att’ys Gen., Common Law Powers of State Attorneys General (Jan. 1975); Natl Ass’n of Att’ys Gen., State Attorneys General Powers and Responsibilities (Emily *387 Myers, ed., 3d ed. 2013). An authoritative summary can be found in People v. Miner, 2 Lans. 396 (N.Y.App.Div.1868), which identifies the following common law powers:
Most, if not all, of the colonies appointed attorney-generals, and they were understood to be clothed, with nearly all the powers, of the attorney-generals of England, and as these powers have never been defined we must go back to the common law in order to ascertain them. The attorney-general had the power, and it was his duty:
1st. To prosecute all actions, necessary for the protection and defense of the property and revenues of the crown.
2d. By information, to bring certain classes of persons accused of crimes and misdemeanors to trial.
3d. By scire facias, to revoke and annul grants made by the crown improperly, or when forfeited by the grantee thereof.
4th. By information, to recover money or other chattels, or damages for wrongs committed on the land, or other possessions of the crown.
5th. By writ of quo warranto, to determine the right of him who claims or usurps any office, franchise or liberty, and to vacate the charter, or annul' the existence of a corporation, for violations of its charter, or for omitting to exercise its corporate powers.
6th. By writ of mandamus, to compel the admission of an officer duly chosen to his office, and to compel his restoration when illegally ousted.
7th. By information to chancery, to enforce trusts, and to prevent public, nuisances, and the abuse of trust powers.
8th. By proceedings in rem, to recover property to which the crown may be entitled, by forfeiture for treason, and property, for which there is no other legal owner, such as wrecks, treasure trove, & c. (3 Black. Com., 256-7, 260 to ,266; id., 427 and 428; 4 id., 308, 312.)
9th. And in certain cases, by information in chancery, for the protection of the rights of lunatics, and others, who are under the protection of the crown. (Mitford’s PL, 24-30, Adams’ Equity, 301-2.)
Significantly, not listed among these enumerated powers in' Miner or in any other source I can find is the common law authority to challenge the actions of the chief executive. It remains abundantly .clear that'at common law in England and as transplanted in the American colonies, and then in the sovereign American states, attorneys general never had the duty or the power to sue the executive to enjoin executive actions, and no Kentucky statute has subsequently granted that power.
Historically, the core function of the attorney general at common law was to assert the legal interests of, the government, particularly the executive head of the government, and the office was accorded the powers and duties essential to the performance of that function. Certainly, the legislature could modify that authority by enacting a statute to vest attorneys general with a plenary power to police the executive branch of government and to initiate civil litigation as their discretion warrants; but it has not chosen to do so,
Johnson v. Commonwealth ex rel. Meredith provides a summary of common law authority that agrees with the history outlined above.
The office of Attorney General existed in England from an early date. Most of the American colonies established an office of the same name, and it was carried into the - succeeding state governments. Legal historians are not in accord as to just what were the powers and prerogatives of the Attorney General in the *388 mother country, but they are agreed that he was the chief law officer of the Crown, managing all the king’s legal affairs, attending to all suits, civil and criminal, in which he was interested, and exercising other high duties and prerogatives, some of which were quite foreign to the legal.
165 S.W.2d at 826. The Johnson court acknowledged uncertainty in determining the “undefined powers [that] attached to the same office in this country,” and was only “certain that the Attorney General has been the chief law officer of the federal or the state governments with the duty of representing the sovereign, national or state in such capacity.” Id.
I respectfully submit that absolutely nothing in the review of the common law duties of attorneys general supports the conclusion that the Attorney General of Kentucky has the legal authority, i.e., the standing, to assert the claims he now asserts against the Governor, the Finance Cabinet Secretary, the State Budget Director, and the Treasurer. Indeed, the majority relies upon the nebulous notion that “duty calls upon the Attorney General (and, thus, confers on him standing) to vindicate the public rights of the people of the Commonwealth.”
The majority grants to the office of the Kentucky Attorney General virtual carte blanche to challenge any action of every officer of the executive branch of government, from the lowest county official to the office of the Governor, including the universities themselves, anytime the sitting attorney general deems it to be in the “public interest” to do so. Such unprecedented authority is an unwise departure from the common law and is totally unsubstantiated by any statutory directive.
The majority addresses a situation in which none of the aggrieved parties with a real interest to protect wish to do so. By cloaking the Attorney General with unbridled authority to assert in any action virtually any claim his office deems to be of “public interest,” even when the affected parties choose not to do so, the majority sets a dangerous, disruptive precedent that is contrary to centuries of English and American common law tradition. The majority’s ruling on standing paves the way for the resolution of an injusticiable issue, and it opens the gate for future adjudication of political issues best left to be resolved within the political branches or by litigation initiated by a party seeking redress for a direct and immediate injury.

. The General Assembly as a body politic in its own right needs no standing because it need not resort to the courts for help in fending off an encroachment by the Governor upon the legislature's rightful powers. The legislative branch has a full - constitutional quiver of legislative arrows with which to defeat any executive intrusion into the legislative prerogative and to cúre any distortion of the legislature’s will caused by such an intrusion. If, rather than using its own constitutional authority to reassert its legislative prerogative, the General Assembly also sought a judicially-imposed remedy, its standing would also have to be properly established.

. The challenged statutes authorized special automobile license plates for members of the General Assembly and for ham radio operators.

. After all, the king enjoyed sovereign immunity, a tribute of sovereignty now enjoyed-not by'the people, but by the state.

.Although not strictly an application of this common law restraint, it may be recalled by many that U.S. Attorney General Elliot Richardson and Deputy Attorney General William Ruckelshaus resigned their respective offices, in part, because they expressly lack the authority to challenge the head of state, President Richard Nixon.

. The year 1607 is determinative because Kentucky has expressly adopted all of English common law in force prior to 1607, the fourth year of the reign of James I. See Aetna Insurance Company v. Commonwealth, 106 Ky. 864, 51 S.W. 624, 627-628 (1899); Ray v. Sweeney, 77 Ky. 1, 9-10 (Ky.1878); and Lathrop v. Commercial Bank of Scioto, 38 Ky. 114, 121 (Ky.1839). After 1607, Kentucky acknowledges the common law of Virginia until the 1792 establishment of Kentucky as a sovereign state.