IN THE COMMONWEALTH COURT OF PENNSYLVANIA

22 S. 40th Street Owner LLC,       :
                  Petitioner      :
                                      :
      v.                        :  No. 689 C.D. 2022
                                        :
Pennsylvania Prevailing Wage   :
Appeals Board,                  :
                  Respondent   :  Argued: September 11, 2023

BEFORE:   HONORABLE PATRICIA A. McCULLOUGH, Judge
                 HONORABLE ANNE E. COVEY, Judge
                 HONORABLE ELLEN CEISLER, Judge

OPINION BY JUDGE CEISLER             FILED: October 13, 2023

22 South 40th Street Owner LLC (Owner) petitions for review of the June 14, 2022 Final Decision of the Pennsylvania Prevailing Wage Appeals Board (PWAB)[1] denying Owner's grievance filed under Section 2(e)(1) of the Pennsylvania Prevailing Wage Act (Act), Act of August 15, 1961, P.L. 987, *as amended*, 43 P.S. § 165-2.2(e)(1).[2]  We affirm the PWAB's Final Decision.

## **Background**

### **1. Factual History**

In 2017, Owner purchased a historically significant building located at 22 South 40th Street in Philadelphia, Pennsylvania (Project), with the intent of

---

[1] By letter dated September 19, 2022, the PWAB notified this Court that it is a disinterested party in this matter; as such, it is not participating in this appeal.

[2] Section 2(e)(1) of the Act was added by the Act of August 9, 1963, P.L. 653, and provides that the PWAB "shall have the power and duty to[] . . . [h]ear and determine any grievance or appeal arising out of the administration of this [A]ct."  43 P.S. § 165-2.2(e)(1).

rehabilitating it for use as a commercial space.[3]  The building was originally known as The West Philadelphia Institute and was designed by renowned Philadelphia architect Frank Furness in the 1870s for use as an auditorium and library for trade instruction.  In 1927, the building was renovated for office and retail use.  By the 1980s, however, the renovations had deteriorated, and eventually the building's exterior was covered with aluminum and its windows were sealed with bricks.

The Project is located near the campuses of both University of Pennsylvania and Drexel University.  Owner asserts that it "purchased the building because it respected its historical significance and feared that it would be subject to the wrecking ball of a student housing developer."  Owner Br. at 6.

After purchasing the building, Owner took steps to list it on both the local and federal registries for historic properties.  To help fund the renovations for the Project, Owner applied for grants from the Commonwealth of Pennsylvania (Commonwealth) under its Regional Assistance Capital Program (RACP).[4]  The Commonwealth awarded Owner a total of $750,000 in RACP grant money in two issuances: $250,000 in 2017 and $500,000 in 2018.

The Project developer, U3 Ventures, LLC, managed all aspects of the Project.  The total cost of the Project was $2,522,889, which included demolition, exterior

---

[3] The building is comprised of three floors and a 22,800-square-foot basement. Reproduced Record (R.R.) at 164a.

[4] "RACP is a Commonwealth grant program administered by the Office of the Budget for the acquisition and construction of regional economic, cultural, civic, recreational, and historical improvement projects. . . . RACP projects are state-funded projects that cannot obtain primary funding under other state programs."  Owner Br. at 7-8 n.2.

Section 302 of the Capital Facilities Debt Enabling Act, Act of February 9, 1999, P.L. 1, *as amended*, 72 P.S. § 3919.302, requires that an RACP project "[have] at least a 50% non-State financial participation documented at the time of application" and "a total project cost of at least $1,000,000."

and interior painting and millwork, masonry, roofing, flooring, ceilings, windows, fire protection, plumbing, heating, ventilation, and air conditioning (HVAC) work, and electrical work.

Owner bifurcated the Project into two phases and contracted each phase separately with the same general contractor, Columbus Construction, LLC. The first contract related to historical renovations, which totaled $810,582 (historical work contract). The second contract related to general renovations, which totaled $1,702,307 (general work contract). Different subcontractors performed the work for each contract.

Owner paid for the historical work contract with RACP funds and paid for the general work contract with non-RACP funds. Owner separated the Project in this way due to "the distinct costs for the historic rehabilitation work on the [building's] exterior and portions of the interior (roofing, painting, masonry, tin ceilings, etc.) from the rest of the building (HVAC, electrical, etc.)." R.R. at 6a. Because Owner applied public funds only to what it categorized as historical renovations, it paid prevailing wages only to the workers who performed work under the historical work contract.[5]

Owner began the Project in early 2019 and completed it in November 2020. The building is presently occupied by five commercial tenants.

## 2. Procedural History

After completion of the Project, Owner wrote to the Department of Labor and Industry's Bureau of Labor Law Compliance (Bureau),[6] describing the two phases

---

[5] Section 5 of the Act provides: "*Not less than the prevailing minimum wages* as determined hereunder shall be paid to *all workmen employed on public work*." 43 P.S. § 165-5 (emphasis added).

[6] The Bureau is participating in this appeal as an intervenor.

of the Project and requesting the Bureau's opinion on the Act's applicability. In its letter to the Bureau, Owner explained its bifurcation of the Project into historical work and general work as follows:

> Our rationale for separating the RACP scope from the non-RACP scope centered on the distinction costs [of] historic rehabilitation work on the exterior and portions of the interior (roofing, painting, masonry, tin ceilings, etc.) from the rest of the building (HVAC, electrical, etc.). We were required to follow strict public guidelines concerning historic preservation standards and reasoned it was a logical use of RACP as a package of work distinct from the general building renovations whose precise scope would be determined by a variety of then-unidentified commercial tenants. Thus, because of the public benefits of historic rehabilitation and the ability to clearly demarcate this work from the balance of tenant-driven improvements, we focused the RACP work on the historic aspects of the [P]roject.
>
> In order to maintain the logical demarcation throughout the construction process[,] we took three administrative steps – we put in place separate construction contracts for the RACP and non-RACP scope, we separated the total [P]roject scope in a way that ensured no sub[]contractor was providing both RACP and non-RACP work, and we required from the general contractor certified pay[]roll documentation to track prevailing wage payments to contractors working on RACP[-]identified scope.

R.R. at 170a.

On February 4, 2021, the Bureau issued a determination that all work performed on the Project was subject to the Act's requirements, stating: "The Act covers the construction work on the Project *in its entirety* and prevailing wages must be paid to the workers." *Id.* at 173a (emphasis added). After reviewing the statutory language and relevant Pennsylvania Supreme Court precedent, the Bureau concluded:

4

There is simply no logic to declar[ing] that there is a line of demarcation between a contract to include the historical restoration work and a contract to perform other construction tasks. *All of this construction work is equally necessary to convert the Project [in]to commercial space.*

An attempt to separate historical restoration work is an obvious attempt to create artificial construction phasing warned about in [*500 James Hance Court v. Pennsylvania Prevailing Wage Appeals Board*, 33 A.3d 555 (Pa. 2011)]. Accordingly, *since there [are] public dollars being used to finance construction for the Project, then the Act covers the entire Project.*

*Id.* (emphasis added).

On April 5, 2021, Owner filed a grievance with the PWAB challenging the Bureau's determination. On August 31, 2021, the parties submitted stipulations of fact and requested an evidentiary hearing, which was held on November 30, 2021. After the filing of post-hearing briefs, the parties presented argument before the PWAB on May 16, 2022.

On June 14, 2022, the PWAB entered its Final Decision, finding that the Act applied to the entire Project and denying Owner's grievance. The PWAB concluded as follows:

While [Owner's] accomplishments on the Project are commendable, we do not agree that it can avoid prevailing wage coverage for the entire Project. In this matter, [*Owner*] *fails to meet its burden of establishing a prima facie case that the Act is not applicable.* First, it did not show "[a] strong and logical . . . demarcation between [the] shell and fit-out work" that would constitute "major, commonly-appreciated construction milestones." Second, it fails to meet its burden to show that the two contracts' financing arrangements were transacted by different entities or, at least, were significantly differentiable from each other.

5

If [Owner] had established a *prima facie* case, then the evidentiary burden would have shifted to the Bureau to establish the applicability of the Act. In this matter, the Bureau would have met this burden because it established that *all prongs of the "public work" definition are met for this Project; most importantly, that the Project meets the third element of "paid for in whole or in part" by public funds.* The work performed in both contracts constituted part of the shell and fit-out portions. Furthermore, the public funding was dependent on the costs of both projects and would not have been available but for the inclusion of the general construction contract costs.

. . . . [*Owner's*] *sole purpose of dividing the Project into two parts was to avoid the RACP's public funds from paying for a considerable portion of the construction costs.* Moreover, [Owner] only separated the Project after it found out that the RACP amount "was substantially less than what [Owner] hoped for." While we attribute no malicious intent in [Owner's] attempt to circumvent the Act, *the* [*PWAB*] *finds the work and financing of both contracts require prevailing wage payments to the workers.*

PWAB Final Decision, 6/14/22, at 22-23 (internal citations omitted) (emphasis added). Owner now petitions this Court for review.[7]

## Analysis

On appeal, Owner asserts that the PWAB erred in concluding that the entire Project was covered by the Act. Owner asserts that it demonstrated a strong and logical demarcation between the historical work and the general work on the Project and that because Owner used RACP funds only for the historical work, it was required to pay prevailing wages only to those workers. We disagree.

---

[7] Our review of the PWAB's decision is limited to determining whether its findings of fact are supported by substantial evidence, whether constitutional rights have been violated, and whether its determination is in accordance with law. *PSP NE, LLC v. Pa. Prevailing Wage Appeals Bd.*, 292 A.3d 1175, 1178 n.2 (Pa. Cmwlth. 2023); Section 704 of the Administrative Agency Law, 2 Pa. C.S. § 704.

Section 5 of the Act mandates the payment of prevailing minimum wages to all workers employed on "public work."  43 P.S. § 165-5.  Section 2(5) of the Act defines "public work" as follows:

> **"Public work"** means construction, reconstruction, demolition, alteration and/or repair work other than maintenance work, *done under contract and paid for in whole or in part out of the funds of a public body where the estimated cost of the total project is in excess of twenty-five thousand dollars ($25,000)*, but shall not include work performed under a rehabilitation or manpower training program.

43 P.S. § 165-2(5) (emphasis added). The policy underlying the Act is to protect workers "employed on public work projects from substandard pay by ensuring that they receive prevailing minimum wage."  *Pa. Nat'l Mut. Cas. Ins. Co. v. Dep't of Lab. & Indus., Prevailing Wage Appeals Bd.*, 715 A.2d 1068, 1072 (Pa. 1998) (*Penn National*).

Our Supreme Court has explained that "to constitute 'public work' four elements must be satisfied: (1) there must be certain work; (2) such work must be under contract; (3) such work must be paid for in whole or in part with public funds; and (4) the estimated cost of the total project must be in excess of $25,000."  *Id.* at 1074; *see also Lycoming Cnty. Nursing Home Ass'n, Inc. v. Dep't of Lab. & Indus., Prevailing Wage Appeals Bd.*, 627 A.2d 238, 242 (Pa. Cmwlth. 1993) ("The definition [of] 'public work' does not require that a 'public body' must be directly involved with the project; only that the project must be paid for in whole or in part with public funds.").  Importantly, "*all elements* of the definition must be satisfied for work to constitute 'public work.'"  *Penn National*, 715 A.2d at 1074 (emphasis added).  Because the Act is a remedial statute, any exceptions to prevailing wage coverage must be narrowly construed.  *Borough of Youngwood v. Pa. Prevailing Wage Appeals Bd.*, 947 A.2d 724, 731 (Pa. 2008).

The only disputed issue in this case is whether the work at issue was "paid for in whole or in part with public funds." *Penn National*, 715 A.2d at 1074.[8] Owner asserts that it paid for the historical work with RACP grant funds and paid for the remaining work, "which was the fit-out of the building for modern-day tenants," with private funds. Owner Br. at 15. In response, the Bureau asserts that Owner "failed to show a strong and logical demarcation between the two phases of the Project" as required by our case law, and, therefore, the entire Project was subject to the Act's requirements. Bureau Br. at 7.

As the parties acknowledge, the leading cases on this issue are *Penn National* and *500 James Hance Court*. In *Penn National*, our Supreme Court considered whether the construction of a new headquarters building for Penn National, a private insurance company, was public work under the Act. To encourage Penn National to remain in the City of Harrisburg (City), the City and an authority entered into a development agreement with Penn National to prepare a site for the eventual construction of a new building in the City. *Penn National*, 715 A.2d at 1069. Under the agreement, the City was responsible for demolition and site preparation, including asbestos removal. Once site preparation was complete, the City would convey the property to Penn National, which would be responsible for the project's construction.

Relevant to this appeal, a key issue in *Penn National* was "whether the Act applie[d] to the entire . . . building project because public bodies initially paid for the asbestos removal portion of site preparation." *Id.* at 1073. Noting the "unique" factual circumstances of the case before it, the Supreme Court determined:

---

[8] It is undisputed that the Project was "certain" and "under contract" and that "the total [P]roject [was] in excess of $25,000." *Penn National*, 715 A.2d at 1074.

The circumscribed role of the City in the building project was to prepare and deliver vacant land. *Once the City completed its contracts for asbestos removal and demolition, and conveyed the property to* [*Penn National*]*, its limited involvement in the development of the property ceased altogether. The City will evidently not be a party to any post-conveyance construction contract.* Other than possible state financing addressed in issue three below, no post-conveyance construction contracts will be paid for in whole or in part with public funds.

*Id.* (emphasis added).

In rejecting the PWAB's assertion that the "total project" must be deemed public work under the Act because the asbestos removal was paid for with public funds, the Supreme Court held:

[T]he term "total project[]" is referred to in the definition of "public work" only in the context of establishing a monetary threshold which excludes from coverage of the Act[] projects costing less than $ 25,000. We do not interpret this prong to confer public work status to work which otherwise fails to satisfy the other three elements of the definition of "public work." Rather, *all elements of the definition must be satisfied for work to constitute "public work."*

*Nothing in* [*S*]*ection 5 of the Act*[*, 43 P.S. § 165-5,*] *mandates that an entire construction project be covered by the Act.* On the contrary, [S]ection 5 is a limited requirement that workmen be paid prevailing wage only on "public work." The legislature could have crafted the definition of "public work" to include work that was paid for in whole or in part with funds of a public body, but instead *it chose to limit prevailing wage to be paid only on that work which satisfies the four-element definition of "public work."*

*Id.* (emphasis added).

The Supreme Court held that the asbestos removal portion of the project – the only portion funded by public monies – was "public work" under the Act, but "the [subsequent] construction work did not constitute public work." *Id.* In other words, "under the distinct facts of th[e] case[,] *the entire . . . building project* [*was*] *not*

9

*covered by the Act simply because asbestos removal was deemed to be public work*." *Id.* (emphasis added). However, because the record lacked evidence regarding possible state financing for the construction phase of the project, the Court remanded the matter to the PWAB to determine whether such financing also triggered coverage under the Act. *Id.* at 1075.[9]

Thirteen years later, in *500 James Hance Court*, our Supreme Court considered whether the construction of a charter school building was "public work" subject to the Act. The project was divided into two phases: the construction of the building (the "shell") and the interior, or "fit-out," of the building for use as a charter school. *500 James Hance Court*, 33 A.3d at 558. The fit-out was financed by a non-profit foundation that received bonds issued by a public authority. The construction of the building's shell was privately funded. *Id.*

On appeal, the Bureau argued that the developer had "artificially bifurcated" the construction project to avoid paying prevailing wages for the entire project. *Id.* at 567. The developer argued, among other things, that bifurcation of shell and fit-out work "is a common business practice" and that "applying . . . an 'overreaching' interpretation of the Act could have a detrimental effect on development in Pennsylvania and the construction industry, and make developers less likely to offer their space to public users." *Id.*

After reviewing the evidence of record, as well its prior ruling in *Penn National*, the Supreme Court determined:

---

[9] In a subsequent appeal following remand, the Supreme Court ultimately concluded that the building's construction was partially funded by public funds and, therefore, required payment of prevailing wages under the Act. *See generally Pa. State Bldg. & Constr. Trades Council, AFL-CIO v. Prevailing Wage Appeals Bd.*, 808 A.2d 881 (Pa. 2002).

10

> [*T*]*here can be as strong and logical a demarcation between shell and fit-out work relative to commercial premises as there is between site preparation and ensuing structural construction.* There is no dispute that interior construction in commercial premises is often tailored to the specific needs and interests of the occupant, and, thus, that the lessee may desire greater participation and supervision over fit-out construction. Therefore, *we reject the Bureau's position that the latitude accorded in Penn National . . . to legitimately phased construction does not apply to the demarcation between shell and fit-out construction of commercial premises. Although Penn National . . . should not be read to authorize artificial construction phasing bearing no independent business justification, its rationale by its terms extends to major, commonly-appreciated construction milestones, such as the completion of site preparation or of a commercial building's shell.* In this regard, it appears undisputed that bifurcation of an office building into a shell and its fit-out is an industry practice which may allow for the creation of a generic exterior, with prospective tenants retaining the ability to tailor the interior for their needs.

*Id.* at 571-72 (internal citations and footnote omitted) (emphasis added). The Supreme Court held that the charter school project was "rationally divisible according to major phases of shell and fit-out construction" and that "[a]s to the shell, [the developer] established the private character of the funding." *Id.* at 576. Therefore, the Court concluded that the Act applied only to the fit-out phase, which was paid for with public funds.

While *Penn National* and *500 James Hance Court* do not set forth a specific test for determining when prevailing wage coverage applies to multi-phased construction projects, we are able glean the following principles from these cases.

In *Penn National*, our Supreme Court first recognized the possibility that the Act's applicability might be limited to a stage or stages of a multi-phase construction project under certain "unique" factual circumstances. In revisiting this issue in *500 James Hance Court*, the Supreme Court explained that when a developer divides a larger project into multiple, separate contracts – some of which are publicly funded

11

and some of which are not – one or more such contracts may be exempt from the Act's coverage if the developer demonstrates a "*strong and logical . . . demarcation*" between the work subject to the Act and the work not subject to the Act. *Id.* at 571 (emphasis added). The Court clarified, however, that *Penn National* should not be read to authorize the use of "artificial construction phasing bearing no independent business justification" in order to avoid prevailing wage coverage. *Id.* Rather, the Court explained that *Penn National*'s rationale applies to "*major, commonly-appreciated construction milestones*, such as the completion of site preparation or of a commercial building's shell." *Id.* at 572 (emphasis added). The Court also cautioned that "the labels appended to transactional documents do not exclusively determine the applicability of regulation under the . . . Act, as the potential for evasion and artifice is too great. Rather, . . . *the economic reality of the transaction should control*." *Id.* (emphasis added). The Supreme Court cited the following examples of "rationally divisible" major construction phases: the shell versus fit-out phases in *500 James Hance Court*; the site preparation versus construction phases in *Penn National*; and the pre-construction versus construction phases in a California Supreme Court case in which public funds were used to pay professionals (such as attorneys and surveyors) involved in pre-construction activities, but the building's construction was privately funded. *Id.* at 571 (citing *City of Long Beach v. Dep't of Indus. Rels.*, 102 P.3d 904 (Cal. 2004)).

The facts of this case, however, do not align with any of these examples. Owner contends that "[t]he historic renovation of the exterior and the interior fit-out are the same as the shell and the interior in [*500*] *James Hance Court*." Owner Reply Br. at 2. However, the Project at issue here is distinguishable from the charter school project in *500 James Hance Court* in a key respect. In that case, there was a

discernable separation between two distinct phases of the construction project: exterior "shell" work and interior "fit-out" work. Here, however, the record establishes that the historical renovations encompassed both interior *and* exterior work. While most of the historical renovations were performed on the building's exterior to restore the facade to its 1927 appearance, many historical renovations were also performed throughout the building's interior, including flooring, ceilings, and carpentry. *See* Stips. of Fact ¶ 16. The general work contract also involved a variety of exterior and interior work. *See id.* ¶ 17. Thus, we conclude that there was no clear demarcation between the shell and fit-out work in this case, as there was in *500 James Hance Court*.

This case is also distinguishable from the project at issue in *Penn National* because in that case, public funds were used only for pre-construction asbestos removal at the site, prior to any building construction. There was a clear demarcation between the site preparation and construction phases, which occurred at different times and were separately financed. Here, however, the historical work and the general work on the Project were often performed simultaneously, albeit by different subcontractors, and "there [was] no . . . delineable time where the site preparation or the shell was completed before the interior fit-out work began." PWAB Final Decision, 6/14/22, at 19-20; *see* Notes of Testimony, 11/30/21, at 62-63.

We also reject Owner's assertion that because the historical work required strict adherence to federal and local historic preservation guidelines, it was divisible from the remainder of the Project, i.e., the fit-out of the interior space for commercial use. The record shows that in certifying the Project for historic preservation tax relief, the Pennsylvania Historical and Museum Commission (Commission) imposed the following condition:

13

> This approval does not extend to work for tenant fit[-]out of the [first] floor commercial space, [the] details of which have not been submitted for review and approval. *Federal regulations governing this program require evaluation of the entire project.* This approval may be superseded if it is found that *the overall rehabilitation* does not meet the [United States Secretary of the Interior's (Secretary)] [s]tandards. *Please submit for review the information regarding any additional work as soon as available to ensure conformance of the overall project to the Secretary's* [s]tandards.

R.R. at 122a (emphasis added); *see id.* at 124a (imposing the same condition). In other words, in order to determine if the Project conformed to historic preservation standards, the Commission's review was not limited to certain facets of "historical" restoration, but encompassed the "overall" Project, *including* "tenant fit[-]out" of the interior spaces.

Unlike the shell/fit-out phases in *500 James Hance Court* and the site preparation/construction phases in *Penn National*, all of Owner's contracted work on the Project was of the same nature and for the same purpose: to renovate the interior and exterior of the building for future commercial use. Both the historical and general work contracts also had the same project manager, architect, and general contractor. Owner's attempt to bifurcate the renovation work in this case into "historical" and "general" phases cannot be viewed as "major, commonly-appreciated construction milestones, such as the completion of site preparation or of a commercial building's shell." *500 James Hance Court*, 33 A.3d at 572; *see also id.* ("[T]he labels appended to transactional documents do not exclusively determine the applicability of regulation under the . . . Act, as the potential for evasion and artifice is too great."). As the PWAB found, "the fit-out work was not contracted for by a separate entity or tailored for a specific tenant, the actual work done on the Project's shell and fit-out was significantly co-mingled between the two contracts,

14

and work under both contracts was not divisible by the type of work performed or dependent on completion dates of either phase." PWAB Final Decision, 6/14/22, at 20.

Because the exceptions to the Act must be narrowly construed, we are reluctant to deny prevailing wage coverage to workers on the Project absent a "strong and logical" demarcation between "major, commonly-appreciated construction milestones," which is lacking here. In so ruling, we are mindful of the remedial purpose of the Act, as described by our Supreme Court:

> [T]he Act imposes a **duty** upon every public body ([Section 4 of the Act, ]43 P.S. § 165-4), every contractor and subcontractor performing public work ([Section 6 of the Act, ]43 P.S. § 165-6), and the Secretary of Labor and Industry ([Section 7 of the Act, ]43 P.S. § 165-7) to implement by different means the specific mandate of the Act that "[n]ot less than the prevailing minimum wages as determined hereunder shall be paid to all work[ers] employed on public work." 43 P.S. § 165-5. *There could be no clearer mandate from the General Assembly that for all public works projects under contract exceeding $25,000, prevailing wages are to be paid to the workers on those projects . . . .*

*Borough of Youngwood*, 947 A.2d at 730-31 (bold in original; italics added).

We conclude that Owner failed to establish a strong and logical demarcation between the historical and general work phases of the Project and, therefore, the Act applies to the entire Project.[10]

---

[10] Before this Court, Owner also argues that the PWAB exceeded its authority in determining that Owner failed to meet the requirements for an RACP grant, as that determination rests solely with the Office of the Budget. *See* Owner Br. at 14; Owner Reply Br. at 2-3. The PWAB, however, made no such finding. Rather, the PWAB found, based on the evidence of record, that the grant money Owner received "was dependent on the costs of both projects and would not have been available but for the inclusion of the general [work] contract." PWAB Final Decision, 6/14/22, at 23. In any event, we need not reach this issue because, regardless of which **(Footnote continued on next page…)**

15

## Conclusion

We conclude, based on the evidence of record, that Owner failed to establish a strong and logical demarcation between the historical work and general work phases of the Project, despite its attempt to bifurcate them. The PWAB correctly found that the historical renovations and general renovations were sufficiently intertwined for purposes of prevailing wage coverage. Accordingly, we affirm the PWAB's Final Decision.

_____
ELLEN CEISLER, Judge

cost figures Owner used to obtain the grant money, it is undisputed that Owner ultimately received $750,000 in RACP grant funds and used those funds to pay for what it categorized as "historical" renovations on the Project, which totaled $810,582. Despite Owner's attempt to demarcate the historical work and general work phases of the Project, we conclude that prevailing wage coverage applies to the entire Project, for the reasons stated above.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| 22 S. 40th Street Owner LLC, | : | |
| Petitioner | : | |
| | : | |
| v. | : | No. 689 C.D. 2022 |
| | : | |
| Pennsylvania Prevailing Wage | : | |
| Appeals Board, | : | |
| Respondent | : | |

# **O R D E R**

AND NOW, this 13th day of October, 2023, the Final Decision of the Pennsylvania Prevailing Wage Appeals Board, dated June 14, 2022, is hereby AFFIRMED.

_____
ELLEN CEISLER, Judge