**[J-52-2023]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, JJ.**

| | | |
|---|---|---|
| URSINUS COLLEGE | : | No. 18 MAP 2023 |
| | : | |
| | : | Appeal from the Order of the |
| v. | : | Commonwealth Court dated |
| | : | August 4, 2022 at No. 828 CD 2021 |
| | : | Reversing the decision of the |
| PREVAILING WAGE APPEALS BOARD | : | Prevailing Wage Appeals Board |
| | : | dated June 25, 2021 at No. |
| | : | PWAB-1G-2018. |
| APPEAL OF: INTERNATIONAL | : | |
| BROTHERHOOD OF ELECTRICAL | : | ARGUED: September 14, 2023 |
| WORKERS, LOCAL NO. 98 | : | |

**OPINION**

**JUSTICE BROBSON** **DECIDED: February 21, 2024**

This discretionary appeal calls upon us to decide whether a construction project undertaken by Ursinus College (Ursinus) constituted a "public work" as defined by the Pennsylvania Prevailing Wage Act (PWA),[1] thereby requiring workmen on the project to be paid prevailing minimum wages, where the Montgomery County Health and Higher Education Authority (Authority) provided conduit financing for the project.[2] Upon careful

---

[1] Act of August 15, 1961, P.L. 987, *as amended*, 43 P.S. §§ 165-1 to -17.

[2] "A conduit financing is generally a situation where tax-exempt bonds are issued by a state or local government and the proceeds are used for a defined qualified purpose by an entity other than the government issuing the bonds . . . ." Dep't of the Treasury Internal Revenue Serv., *Your Responsibilities as a Conduit Issuer of Tax-Exempt Bonds* 1 (Sept. 2019), https://www.irs.gov/pub/irs-pdf/p5005.pdf; *see also* Nat'l Ass'n of Bond Lawyers, *Conduit Financing*, https://www.nabl.org/bond-basics/conduit-financing/ (last visited Jan. 10, 2024) (defining "conduit financing" as "[a] financing in which the [i]ssuer (continued…)

review, we agree with the conclusion reached by the Commonwealth Court that the project does not constitute a "public work" within the meaning of the PWA based upon a plain reading of the statute and the economic reality of the specific financial transaction at issue. Accordingly, we affirm.

## I. BACKGROUND

### A. Relevant Law

The General Assembly enacted the PWA with the primary purpose of "protect[ing] workmen employed on public work projects from substandard pay by ensuring that they receive prevailing minimum wage." *Pa. Nat'l Mut. Cas. Ins. Co. v. Dep't of Lab. & Indus.*, 715 A.2d 1068, 1072 (Pa. 1998) (*Penn National I*); *see also* Section 5 of the PWA, 43 P.S. § 165-5 ("Not less than the prevailing minimum wages as determined [under the PWA] shall be paid to all workmen employed on public work."). The PWA defines "[p]ublic work," in relevant part, to "mean[] construction, reconstruction, demolition, alteration and/or repair work other than maintenance work, done under contract and paid for in whole or in part out of the funds of a public body where the estimated cost of the total project is in excess of twenty-five thousand dollars ($25,000)."[3] Section 2(5) of the PWA, 43 P.S. § 165-2(5). In view of the statutory definition, this Court has explained that a project will qualify as a "public work" when the following four conditions are satisfied: "(1) there [is] certain work; (2) such work [is] under contract; (3) such work [is] paid for in whole or in part with public funds; and (4) the estimated cost of the total project [is] in excess of $25,000." *Penn National I*, 715 A.2d at 1074. As discussed in further detail below, this

---

issues the [b]onds to finance a project to be used primarily by a third party, usually a private business").

[3] This definition excludes "work performed under a rehabilitation or manpower training program." 43 P.S. § 165-2(5).

matter concerns only the third element—*i.e.*, whether the project at issue was "paid for in whole or in part with public funds." *Id.*

In various instances relevant hereto, our courts have analyzed the definition of "public work" and whether certain projects were "paid for in whole or in part with public funds," thus subjecting the projects to the PWA's provisions. To begin, in *Penn National I*, this Court held that the construction of a new headquarters for Pennsylvania National Mutual Casualty Insurance Company (PNI) in the City of Harrisburg did not constitute a "public work" *in toto* simply because public bodies funded an initial phase of the project in a manner that met the four elements set forth above. *Penn National I*, 715 A.2d at 1074-75 (explaining that "[n]othing in [S]ection 5 of the [PWA] mandates that an entire construction project be covered by the [PWA]," that coverage was limited to "work which satisfies the four[-]element definition of 'public work,'" and that, "under the distinct facts [presented,] the entire PNI building project [wa]s not covered by the [PWA] simply because asbestos removal was deemed to be public work").

Thereafter, in a subsequent appeal following remand, this Court held that PNI's use of tax increment financing[4] to fund part of the same project at issue in *Penn National I* rendered the project a "public work" subject to the PWA. *Pa. State Bldg. & Constr. Trades Council, AFL-CIO v. Prevailing Wage Appeals Bd.*, 808 A.2d 881, 882 (Pa. 2002) (*Penn National II*). The specific financing mechanism at issue in *Penn National II*, accomplished through utilization of the Tax Increment Financing Act (TIF Act),[5] is of particular import to

---

[4] In general, tax increment financing "is 'a technique used by a municipality to finance commercial developments usually involving issuing bonds to finance land acquisition and other up-front costs, and then using the additional property taxes generated from the new development to service the debt.'" *Mazur v. Trinity Area Sch. Dist.*, 961 A.2d 96, 99 (Pa. 2008) (quoting *Ondek v. Allegheny Cnty. Council*, 860 A.2d 644, 645 n.2 (Pa. Cmwlth. 2004)).

[5] Act of July 11, 1990, P.L. 465, *as amended*, 53 P.S. §§ 6930.1-.13. The General Assembly enacted the TIF Act to provide a "means to finance public facilities and (continued…)

the instant matter. First, the City of Harrisburg and certain other public "taxing bodies approved the creation of a tax increment district[] and agreed to participate therein by adopting resolutions to that effect." *Penn National II*, 808 A.2d at 886. Next, the Harrisburg Redevelopment Authority (HRA) issued tax increment bonds,[6] which PNI purchased. *Id.* The bond proceeds "were held in trust under an indenture and were disbursed by PNC Bank, [as] trustee, to" PNI's wholly owned subsidiary, as the owner of the project buildings, "to pay a portion of the construction costs of the project." *Id.* Moreover, as owner of the project buildings, PNI's subsidiary paid the base real estate tax and the tax increment on the property to the public taxing bodies, which "were required to pay over to . . . HRA[] that portion of the collected tax monies that represent[ed] the tax increment." *Id.* "[T]hese monies [we]re then used to pay off the tax increment bonds." *Id.* at 886-87. Notably, the taxing bodies received and held for a time the positive tax increments before depositing them into a tax increment fund, which contained "all tax increments and all revenues from the sale of tax increment finance bonds or notes and from which money [wa]s disbursed to pay project costs for the district or to satisfy claims of holders of tax increment bonds or notes." *Id.* at 886.

Upon review of the above financing structure, the Court held "that the work, *i.e.*, the cost of construction, . . . was 'paid for in whole or in part with public funds.'" *Id.* at 889. The Court reasoned:

---

residential, commercial and industrial development and revitalization" in certain blighted areas of the Commonwealth. Section 2(a)(1), (b) of the TIF Act, 53 P.S. § 6930.2(a)(1), (b).

[6] The bonds: (1) "mature[d] over a period not to exceed twenty years from the date of issue;" (2) "were a limited obligation of HRA, and, on their face, indicated that HRA [did] not pledge payment of the principal of, or interest on, the bonds;" and (3) "were secured by a mortgage and security agreement between [a wholly owned subsidiary of PNI], as mortgagor, and PNC Bank, as mortgagee, on the office building and parking garage" to be constructed under the project. *Penn National II*, 808 A.2d at 886.

[T]he taxing bodies actually collect the tax increment dollars in question. Although the taxing bodies only retain the monies paid on the property's tax base and the tax increment dollars are paid over to the trustee to be used to pay off the tax increment bonds, nevertheless, . . . for a time these monies do rest in the public coffers. Significantly, the statutory financing at issue here is not a tax abatement, where the taxing authority agrees to forego receiving property taxes on a certain property for a certain time. To the contrary, the tax money is actually collected by the taxing bodies, and, in turn, these dollars are used to pay off the tax increment bonds that are used to pay the cost of construction on the project.

*Id.* (footnote omitted). As such, the Court concluded that "[t]he monies paid to the taxing authorities as tax increments, which, in turn, are used to pay off the bonds that are used to pay the cost of construction[,] are public funds for purposes of the [PWA]."[7] *Id.*

In *500 James Hance Court v. Pennsylvania Prevailing Wage Appeals Board*, 33 A.3d 555 (Pa. 2011), this Court considered whether the PWA applied to a developer's construction of a "building shell" that was to be fitted out by a charter school, where the charter school entered into a predevelopment lease with the developer for the building premises.[8] *500 James Hance Ct.*, 33 A.3d at 557-58. In addressing this scenario, and particularly "whether the stream of rental payments required [from the charter school to the developer] under the . . . lease arrangement [we]re tantamount to construction financing," the Court explained that "the labels appended to transactional documents do not exclusively determine the applicability of regulation under the [PWA], as the potential for evasion and artifice is too great. Rather, as in other settings, the economic reality of the transaction should control." *Id.* at 572. The Court further indicated "that risk allocation

---

[7] The Court further elaborated on the PWA's requirement that "work must be under contract" for purposes of coverage, holding that a public body need not be party to the construction contracts at issue for a project to be deemed "public work." *Penn National II*, 808 A.2d at 899-90.

[8] Pursuant to Section 1715-A(10)(iii) of the Charter School Law, Act of March 10, 1949, P.L. 30, *as amended*, 24 P.S. § 17-1715-A(10)(iii), "[b]oards of trustees and contractors of charter schools are made subject to the provisions of the [PWA]." *500 James Hance Ct.*, 33 A.3d at 557.

should be a prominent consideration in assessing the economic reality of a business transaction," particularly for purposes of analyzing the applicability of the PWA. *Id.* at 573. Ultimately, the Court concluded that the nature of the lease arrangement at issue did not implicate the PWA's coverage. *Id.* at 574-77.

Turning to Commonwealth Court precedent, in *Lycoming County Nursing Home Association, Inc. v. Department of Labor & Industry*, 627 A.2d 238 (Pa. Cmwlth. 1993), that court addressed whether the construction of a nursing home and personal care facility undertaken by Lycoming County (County) and the Lycoming County Nursing Home Association, Inc. (Association), was a "public work" covered by the PWA. *Lycoming Cnty. Nursing Home Ass'n, Inc.*, 627 A.2d at 240. The Lycoming County Commissioners (Lycoming Commissioners) established the Association as a private, nonprofit entity for purposes of constructing and operating the new facility, and they served as members of the Association's Board of Directors, initially in their official capacity and later as private citizens. *Id.* During this time, the County loaned the Association $500,000 to cover start-up construction costs and entered into a lease/loan agreement with the Association relative to the project. *Id.* Pursuant to the lease/loan agreement, which was signed by the same person acting on behalf of both the County and the Association, the County leased the land for the project to the Association for 25 years at $1 per year, with all land improvements to become County property when the agreement terminated. *Id.* at 240-41. In exchange, the Association agreed to construct and operate the facility. *Id.* at 241. Additionally, under the lease/loan agreement, the County authorized the issuance of bonds in an amount exceeding $11.5 million and then loaned the proceeds to the Association. *Id.* The County also remained liable for repayment of the bonds to bondholders in the event the Association defaulted. *Id.*

The Commonwealth Court held that the PWA covered the project as a "public work," reasoning that the evidence demonstrated that public funds paid for the project. *Id.* at 242. In doing so, the Commonwealth Court rejected the argument that the Association (and not the County) was the actual party to the construction contract and that, despite receiving public funds used to pay for the project, the Association was not a "public body" to which the PWA applies. *Id.* at 242-44 ("The definition for 'public work' does not require that a 'public body' must be directly involved with the project[,] only that the project must be paid for in whole or in part with public funds."). The Commonwealth Court also rejected the contention that the PWA did not apply because the County only provided financial resources to facilitate the project and was not a party thereto, noting that the County "clearly was not *just* involved with the financing of the project." *Id.* at 243 (emphasis in original) (relying further upon opinion of attorney general that "funds for a project, when obtained through the issuance of revenue bonds by [authority organized under the Pennsylvania Industrial Development Authority Act[9]] for which it pledges its credit and must repay in the event of default by the private entity, are public funds when a public purpose is furthered"). The Commonwealth Court added that, *inter alia*, "the County loaned money to the Association[,] . . . remained liable on the bond if the Association defaulted," and "leased the property to the Association," and the Lycoming Commissioners "influenced the Association when it contracted for the building" and "appointed themselves as [d]irectors." *Id.* The Commonwealth Court concluded that, where "the Association used public funds for a public purpose that was proposed by a 'public body,' [the Association] stands in the shoes of the County, is a 'public body' doing 'public work[,]' and is covered by the [PWA]." *Id.* Lastly, the Commonwealth Court held that the Association was the alter-ego of the County under the facts presented, justifying

---

[9] Act of May 17, 1956, P.L. (1955) 1609, *as amended*, 73 P.S. §§ 301-315.

the piercing of the corporate veil to prohibit the County from relying on the independence of the Association to eschew compliance with the PWA. *Id.* at 243-44.

In *Borough of Ebensburg v. Prevailing Wage Appeals Board*, 893 A.2d 181 (Pa. Cmwlth. 2006), the Commonwealth Court held that the PWA covered the entirety of a public body's curbing and sidewalk replacement project, where the public body paid for the project up front but ultimately assessed the sidewalk portion of the project to the affected private property owners. *Borough of Ebensburg*, 893 A.2d at 183, 185. The Commonwealth Court reasoned that "[t]he fact that [a portion of the project's cost] was later reimbursed from private citizens does not[] . . . except th[e] contract from being 'paid for in whole or in part out of the funds of a public body' because the fact that its funds were replenished is immaterial." *Id.* at 185. The Commonwealth Court, relying upon its decision in *Pennsylvania National Mutual Casualty Insurance Co. v. Department of Labor & Industry*, 667 A.2d 753 (Pa. Cmwlth. 1995), *rev'd on other grounds*, 715 A.2d 1068 (Pa. 1998), explained:

> [T]he origin of the funds is not the determining factor. The payment by the public body governs. Since the [PWA] only requires part of the contract to be paid out of public funds and [the public body] admits it paid for all of the curbing, there is no question part of the contract was paid for out of public funds. [The public body] argues, however[,] that the sidewalk costs should be separated from the curbing. There is no proof that the . . . contract was intended to be separable in any respect[,] and the [Prevailing Wage Appeals Board (Board)] properly rejected [the public body's] contention to report the costs of the curbing [separate] from those of the sidewalks.
>
> This [p]roject, the demolition and reconstruction of sidewalks and curbing, done under contract, paid for at least in part out of the funds of a public body, and with an estimated cost in excess of twenty-five thousand dollars, falls within the definition of "public work" in Section 2(5) of the [PWA] and is thus subject to the prevailing wage provisions of that [statute].

*Id.* at 186.

Finally, we discuss our decision in *Willman v. Children's Hospital of Pittsburgh*, 479 A.2d 452 (Pa. 1984), which did not concern the PWA but, nonetheless, guided the

Commonwealth Court's decision in this matter as explained further below. In *Willman*, the Children's Hospital of Pittsburgh (Hospital), a private nonprofit charitable corporation, entered into a construction management agreement with Mellon-Stuart Company (Mellon-Stuart), a private business corporation, under which Mellon-Stuart agreed to perform all construction management services relative to an extensive construction and renovation project for the Hospital for a guaranteed maximum price. *Willman*, 479 A.2d at 453. Financing for the project was provided as follows: The Allegheny County Hospital Development Authority (ACHDA) issued bonds pursuant to a trust agreement with Mellon Bank, N.A., (Mellon Bank) as trustee. *Id.* Additionally, the ACHDA and the Hospital entered into a lease agreement, whereby the Hospital leased the project premises to the ACHDA in exchange for the ACHDA's payment of a lump-sum, fixed, rental amount equal to the net proceeds realized from the sale of the issued bonds. *Id.* at 453-54. Simultaneous with their execution of the lease agreement, the ACHDA and the Hospital also executed a sublease, which became a general obligation of the Hospital. *Id.* at 454. Under the sublease, the ACHDA sublet the premises back to the Hospital in exchange for rental payments from the Hospital in an amount equal to the full sum necessary to pay the principal, interest, and premiums, if any, on the bonds. *Id.* Furthermore, the ACHDA and Mellon Bank executed an indenture, pursuant to which the ACHDA assigned all of its right, title and interest in and to the sublease to Mellon Bank as trustee and pledged to the trustee the receipts and revenues payable to the ACHDA under the sublease. *Id.*

Of additional note, pursuant to "[t]he official statement published in connection with the bond issue," the bonds were "limited obligations of the [ACHDA] and neither the general credit of the [ACHDA] nor the general credit or taxing power of the Commonwealth of Pennsylvania or any political subdivision thereof [wa]s pledged for the payment of the . . . [b]onds." *Id.* at 453 n.3. Moreover, the bonds were not and would not

be deemed "to be an obligation of the Commonwealth of Pennsylvania or of any political subdivision thereof." *Id.* The official statement further provided that the ACHDA had no taxing power and that the bonds would "be secured under the provisions of the [i]ndenture, the [l]ease and the [s]ublease, . . . and [would] be equally and ratably payable solely from [r]eceipts and [r]evenues derived by the [ACHDA] under its [s]ublease with, and additionally secured by the guaranty of [the] Hospital." *Id.*

The issue presented to this Court in *Willman* concerned whether the Hospital's project was subject to public competitive bidding under the Municipal Authorities Act of 1945 (MAA of 1945)[10] given the ACHDA's role in financing in the project. *Id.* at 455. In this regard, Section 10 of the MAA of 1945 provided, at the relevant time, as follows:

> All construction, reconstruction, repairs or work of any nature *made by* any Authority, where the entire cost, value or amount of such construction, reconstruction, repairs or work, including labor and materials, shall exceed two thousand five hundred dollars ($2,500), . . . shall be done only under contract or contracts to be entered into by the Authority with the lowest responsible bidder upon proper terms, after due public notice has been given asking for competitive bids as hereinafter provided.

*Id.* at 455 (quoting Section 10 of the MAA of 1945, 53 P.S. § 312(A)) (alteration and emphasis in original).

Upon review, the Court concluded that the public bidding requirement did not apply to the Hospital's project. *Id.* at 456. In doing so, the Court considered the arguments that all construction projects involving an authority are subject to the requirement and that use of the phrase "'made by' [in Section 10 of the MAA of 1945] . . . should be construed broadly to include financing by tax-free bonds or any property interest of an [a]uthority in a project." *Id.* Ultimately rejecting these contentions, the Court referred to the reasons for requiring public competitive bidding and highlighted that "[t]he obvious intention of a

---

[10] Act of May 2, 1945, P.L. 382, *as amended*, *formerly* 53 P.S. §§ 301-322, repealed by Section 3 of the Act of June 19, 2001, P.L. 287. The consolidated Municipal Authorities Act (MAA), 53 Pa. C.S. §§ 5601-5623, contains similar provisions.

public competitive bidding requirement is to secure public contracts for the use of the government or a governmental body at the lowest cost to the taxpayers." *Id.* at 456. The *Willman* Court explained that "[t]he reasons for open competitive bids do not exist" relative to the Hospital's project, as the project was "a private undertaking at no cost to the taxpayers." *Id.* (elaborating that no aspect of project "involve[d] the use or risk of public funds or public credit" or implicated any costs of construction to be borne by taxpayers; rather, "project [was] a private project, backed by private property and private funds[,] and [wa]s to be managed and constructed by private parties"). Noting its belief that the General Assembly did not "intend[] to require open competitive bidding where an authority merely serves as a financing conduit for an entirely private project" based on the language of Section 10 of the MAA of 1945, and because the ACHDA's "role [wa]s limited to providing a financing vehicle to assist the private parties in the construction" for the project, the Court held that the project was not subject to the public competitive bidding requirement. *Id.*

## B. The Present Matter

Having provided the above summary of the relevant law, we turn to the facts of the case currently before us. Ursinus is a private, nonprofit liberal arts college located in Collegeville, Pennsylvania. The Authority was formed by the Board of County Commissioners of Montgomery County (County Commissioners) under the MAA and is authorized to issue bonds relative to projects for eligible educational institutions such as Ursinus. In 2016, Ursinus' Board of Trustees adopted resolutions authorizing Ursinus to pursue certain construction projects, including the construction of an Innovation and Discovery Center and a new HUB/Welcome Center (hereinafter referred to collectively as "Project"), and to seek from the Authority "a loan of funds derived from the issuance of tax[-]exempt bonds . . . in order to provide the Project [f]inancing, up to a maximum

amount of" $23 million. (Original Record (O.R.), Item No. 1, Board's Decision dated 6/25/2021, at 3, 6 (second alteration in original).) Additionally, the Authority adopted a resolution announcing that it was "undertak[ing] to assist [Ursinus] in connection with the financing of the [Project] through the issuance of up to" $23 million in bonds. (*Id.* at 6 (second alteration in original).) The County Commissioners also adopted a resolution approving the Project and the Authority's issuance of the bonds.

Ursinus and the Authority, as well as The Bank of New York Mellon Trust Company, N.A. (Trustee), and RBC Capital Markets, LLC (Underwriter), executed several documents relative to financing the Project that are pertinent here. These documents include: (1) a Trust Indenture, executed between the Authority and the Trustee; (2) a Loan Agreement, executed between the Authority and Ursinus; (3) an Assignment of the Loan Agreement to the Trustee, executed by the Authority; (4) a Bond Purchase Agreement, executed by the Underwriter, the Authority, and Ursinus; (5) a "Closing Cash Flow Memorandum" (Closing Memorandum), issued by the Underwriter to the Authority and Ursinus; and (6) a Closing Statement, executed by the Authority and Ursinus and directed to the Trustee. The parties to the Trust Indenture, Loan Agreement, and Assignment executed those three documents the same day, on November 1, 2016, and the Authority, Ursinus, and the Underwriter entered into the Bond Purchase Agreement approximately two weeks later, on November 15, 2016. Under the Loan Agreement, the Authority agreed to loan Ursinus the proceeds from the sale of the bonds and, in exchange, Ursinus agreed to make loan payments corresponding, as to both amounts and dates due, with the principal or redemption price of and interest on the bonds.[11]

---

[11] Section 4.03 of the Loan Agreement further provided that "[t]he obligation of [Ursinus] to make the payments required by [the Loan Agreement] shall be absolute and unconditional. Such obligation is a general obligation of [Ursinus]; the full faith and credit of [Ursinus] are pledged to the payment of all sums due [under the Loan Agreement]." (O.R., Item No. 4, Loan Agreement dated 11/1/2016, at 15.) Section 4.07 of the Loan (continued…)

(O.R., Item No. 4, Loan Agreement dated 11/1/2016, at 1, 13, 15.) Pursuant to the Assignment, the Authority assigned substantially all of its right, title, and interest in and to the Loan Agreement—including the loan payments thereunder and all security therefore—to the Trustee.[12] (O.R., Item No. 4, Assignment dated 11/1/2016 and attached

---

Agreement also provided that, "[t]o secure the payment of the amounts payable by [Ursinus] . . . and the performance of all of its other obligations under this Loan Agreement, [Ursinus] hereby pledges, assigns and grants to the Trustee, as assignee of the Authority, a lien on and a security interest in its Pledged College Revenues." (*Id.* at 16; *see also id.* at 7-8 (defining "Pledged College Revenues").) Moreover, pursuant to Section 5.14 of the Loan Agreement, Ursinus agreed to indemnify the Authority and hold the Authority harmless for and against, *inter alia*, any and all claims as outlined therein. (*Id.* at 24-25.)

[12] In this regard, the Loan Agreement also provided, in relevant part:

> Section 1.07.  <u>Assignment to Trustee</u>.  The Authority hereby notifies [Ursinus], and [Ursinus] hereby acknowledges, that all of the Authority's right, title and interest in this [Loan] Agreement (except Unassigned Rights) are being assigned and pledged to the Trustee as security for the [b]onds. [Ursinus] consents to such assignment and acknowledges that the [b]onds are being issued in reliance by the Trustee upon the assignment of the Authority's rights under this Loan Agreement.  [Ursinus] agrees that it shall perform all obligations and pay all amounts due from the Authority under the [b]onds and the [Trust] Indenture so that at all times there shall be no default thereunder. . . .

(O.R., Item No. 4, Loan Agreement dated 11/1/2016, at 10.)  The Trust Indenture additionally provided that the Authority

> does hereby assign, transfer and pledge to the Trustee . . . and grant to the Trustee . . . a security interest in:

> > a.  All right, title and interest (but not the obligations) of the Authority under and pursuant to the terms of the Loan Agreement, all loan payments and all other payments, revenues and receipts receivable by the Authority thereunder (except for the Unassigned Rights); and

> > b.  All of the right, title and interest of the Authority in and to all Funds and Accounts established under this [Trust] Indenture (except for the Rebate Fund) and all moneys and investments now or hereafter held therein and all present and future Revenues.

(continued…)

to Loan Agreement.) Pursuant to the Bond Purchase Agreement, the Underwriter agreed to purchase the bonds issued by the Authority and pay the purchase price "to the order of" the Authority directly at the offices of the Trustee. (O.R., Item No. 5, Bond Purchase Agreement dated 11/15/2016, at 1, 8; *see also* O.R., Item No. 4, Loan Agreement dated 11/1/2016, at 13 (providing, in Section 3.01, that bond proceeds shall be loaned to Ursinus and "be paid over to the Trustee for application in accordance with" Trust Indenture terms).

Moreover, as concerns the proceeds of the Authority's sale of the bonds and Ursinus' loan payments, the Trust Indenture under which the bonds were issued and secured also created a "Project Fund" and "Bond Fund." (O.R., Item No. 3, Trust Indenture dated 11/1/2016, at 18-19.) With respect to the "Project Fund," the Trust Indenture required the Trustee to deposit the bond proceeds received from the Underwriter into that fund; it also directed the Trustee to make disbursements for Project costs to Ursinus.[13] (*Id.* at 18; *see also* O.R., Item No. 4, Loan Agreement

---

TO HAVE AND TO HOLD, the Loan Agreement, the loan payments, Funds (except the Rebate Fund), Accounts, Revenues and any other revenues, property, contracts or contract rights, accounts, accounts receivable, chattel paper, instruments, general intangibles or other rights and the proceeds thereof, which may, by delivery, assignment or otherwise, be subject to the lien and security interest created by this [Trust] Indenture and the other right, title and interest hereby assigned, transferred and pledged or agreed or intended so to be (collectively the "Trust Estate") to the Trustee and its successors in said trust and to its and their assigns forever[.]

(O.R., Item No. 3, Trust Indenture dated 11/1/2016, at 2.)

[13] More specifically, the Trustee could make disbursements from the Project Fund to Ursinus directly or to any person designated by Ursinus for Project costs. (O.R., Item No. 4, Loan Agreement dated 11/1/2016, at 13); *id.* at C-1 to C-2, Exhibit B (Form of Disbursement Request).) Of further note, the Trust Indenture provided that, "[p]ending disbursement, the moneys and investments deposited in the Project Fund shall be held as security for the Outstanding Bonds." (O.R., Item No. 3, Trust Indenture dated 11/1/2016, at 18.)

dated 11/1/2016, at 13.)  As for the "Bond Fund," the Trust Indenture similarly required the Trustee to deposit the loan payments directly received from Ursinus into that fund, and it directed the Trustee to make payments of the principal or redemption price of, and interest on, the bonds to the bondholders.  (O.R., Item No. 3, Trust Indenture dated 11/1/2016, at 19; O.R., Item No. 4, Loan Agreement dated 11/1/2016, at 15.) According to the Closing Memorandum and Closing Statement, the transaction closed on November 22, 2016, with Ursinus paying the costs, fees, and expenses of the transaction. (O.R., Item No. 6, Closing Statement dated 11/22/2016; O.R., Item No. 18, Exhibit A, Closing Cash Flow Memorandum dated 11/21/2016.)

Of additional pertinence to the instant appeal, the Trust Indenture also included an attached form of bond, which provided:

> THIS BOND IS A LIMITED OBLIGATION OF THE AUTHORITY AND IS PAYABLE SOLELY FROM THE SOURCES REFERRED TO HEREIN. NEITHER THE GENERAL CREDIT OF THE AUTHORITY NOR THE CREDIT OR THE TAXING POWER OF THE COUNTY OF MONTGOMERY, THE COMMONWEALTH OF PENNSYLVANIA OR OF ANY POLITICAL SUBDIVISION THEREOF IS PLEDGED FOR THE PAYMENT OF THIS BOND, NOR SHALL THIS BOND BE OR BE DEEMED A GENERAL OBLIGATION OF THE AUTHORITY OR AN OBLIGATION OF THE COUNTY OF MONTGOMERY, THE COMMONWEALTH OF PENNSYLVANIA OR OF ANY POLITICAL SUBDIVISION THEREOF. THE AUTHORITY HAS NO TAXING POWER.

(O.R., Item No. 3, Trust Indenture dated 11/1/2016, Exhibit A, Form of Bond, at A-2.)  The form of bond also provided that

> [t]he [b]onds are payable solely from the payments made by [Ursinus] under the Loan Agreement dated as of November 1, 2016[,] . . . between the Authority and [Ursinus] relating to the [b]onds, from any other moneys held by the Trustee under the [Trust] Indenture for such purpose, and the Trust Estate defined in the [Trust] Indenture.

(*Id.* at A-3.)[14]

---

[14] Furthermore, the bonds and other transaction documents provided that there could be no recourse against the Authority.  (O.R., Item No. 3, Trust Indenture dated 11/1/2016, (continued…)

By letter dated April 19, 2018, the International Brotherhood of Electrical Workers, Local No. 98 (IBEW)[15] sought an opinion from the Department of Labor and Industry's Bureau of Labor Law Compliance (Bureau) regarding whether the PWA covered the Project. By letter dated May 4, 2018, the Bureau rendered its opinion that, based upon a review of the transaction documents, the requirements of the PWA were inapplicable to the Project. (O.R., Item No. 15, Bureau Letter dated 5/4/2018.) The Bureau reasoned that, while the Authority was a public body for purposes of the PWA, the Authority was not ultimately financing the Project. Rather, according to the Bureau, because the Project was financed completely by loans from the Authority, which Ursinus was required to repay in their entirety, the Project was ultimately funded through private sources and exempt from coverage under the PWA. Thereafter, IBEW filed a grievance with the Board challenging the Bureau's opinion.

On June 25, 2021, the Board issued a decision and order granting IBEW's grievance and concluding that the PWA applied to the Project. The Board first observed

at 30 (providing, in Section 8.09, that Authority "shall have no liability for any failure to fulfill, or breach by [Ursinus] of, [Ursinus'] obligations under the [b]onds, th[e Trust] Indenture, the Loan Agreement or otherwise"); *id.* at 50 (providing, in Section 14.01, that "[n]o recourse shall be had for any claim based on th[e Trust] Indenture or the [b]onds, including but not limited to the payment of the principal or redemption price of, or interest on, the [b]onds, against the Authority" and that "[t]he obligations and liabilities of the Authority arising under th[e Trust] Indenture shall be payable solely from the Revenues"); O.R., Item No. 3, Trust Indenture dated 11/1/2016, Exhibit A, Form of Bond, at A-2 to A-3, A-5 (providing twice that no recourse shall be had for payment of bond or any claim based on bond or Trust Indenture against Authority); O.R., Item No. 4, Loan Agreement dated 11/1/2016, at 34 (providing, in Section 7.05(b), that "[t]he [b]onds are payable solely from the Revenues and other moneys held by the Trustee under the [Trust] Indenture for such purpose, including payments received under th[e] Loan Agreement" and that "[t]here shall be no other recourse under the [b]onds, the [Trust] Indenture, th[e] Loan Agreement or otherwise against the Authority or any other property now or hereafter owned by it"); *see also id.* at 33 (providing, in Section 7.01, that Ursinus "assumes and agrees to perform all of the covenants and other obligations of the Authority under" Trust Indenture).)

[15] IBEW is a labor organization that represents electrical workers, including "workmen" within the meaning of Section 2(7) of the PWA, 43 P.S. § 165-2(7) (defining "Workman").

that the Authority was indisputably a public body and that it was serving its public purpose in helping to finance the Project by issuing the bonds. (O.R., Item No. 1, Board's Decision dated 6/25/2021, at 16-18.) Observing that "[t]he Authority provided financing for the . . . Project[], through the Trustee, using its statutory ability to issue bonds and loan the proceeds to Ursinus to pay for the construction costs," the Board emphasized that "[t]he financing was specifically dedicated to paying for the construction costs of the . . . Project[]," "the Authority authorized and approved the Project[] for the benefit of Ursinus," and "[t]he Authority authorized and directed the Trustee to make disbursements from the Project Fund," as evidenced by the financing documents. (*Id.* at 17-18.) The Board concluded that, at bottom, "the financing utilized to pay the construction costs could not have occurred without the Authority and its ability to issue the [b]onds." (*Id.* at 18 (additionally explaining that "the financing stream for the . . . Project[] involved the funds of a public body").)

The Board also rejected the Bureau's position that the Project was not covered by the PWA because Ursinus financed the Project through a loan that it must ultimately repay in full. The Board reasoned that, in *Penn National II*, this Court held that the funds involved were "used to pay the cost of construction on the project" at issue without any use of the term "ultimately" as a qualifier impacting the analysis. (*Id.* (quoting *Penn National II*, 808 A.2d at 889).) As such, the Board explained that "the fact that the funds may have been replenished with private funds is irrelevant to [the] analysis." (*Id.* at 18-19 (relying upon *Borough of Ebensburg*, 893 A.2d at 185).) Moreover, the Board found the arguments made by Ursinus and the Authority in support of the conclusion that the PWA did not cover the Project to be "unavailing when the financing was generated by a public body for the purpose of paying for construction projects." (*Id.* at 19.) While recognizing that "the Authority may not have directly paid for" the Project, the Board reiterated that

Ursinus would not have had this funding stream available but for the existence of the Authority and its coordination of the funding through its statutory powers as a public body. The fact that the funds wound their way through financing processes and contractual relationships with the Trustee and Underwriter does not change the reality that the funds were only available because of the Authority's statutory ability to issue the [b]onds. The proceeds from the [b]ond sale did not lose their character as the "funds of a public body" just because the monies journeyed through other nonpublic financial transactions.

(*Id.*) Accordingly, the Board concluded that the funds generated and used to pay for the Project were funds of a public body for purposes of determining whether the Project was a "public work" under the PWA and that the PWA, therefore, was applicable to the Project. (*Id.* at 19-20.) The Board, thus, concluded that all workers employed on the Project were entitled to be paid the applicable prevailing minimum wage rate as determined by the Bureau. (*Id.*)

Ursinus appealed to the Commonwealth Court, which reversed the Board's order in a unanimous en banc opinion. *Ursinus College v. Prevailing Wage Appeals Bd.*, 280 A.3d 1113 (Pa. Cmwlth. 2022) (en banc). The Commonwealth Court first observed that "[a]t issue here is the plain language in Section 2(5) of the [PWA], which defines public work as construction work 'paid for in whole or in part out of the funds of a public body.'" *Ursinus College*, 280 A.3d at 1122-23. Turning to a "review [of] all the bond documents and other evidence in the record to determine the economic reality of the funding for this transaction" and emphasizing that the Authority did not hold or disburse the funds, the Commonwealth Court concluded that "the Project was not paid for 'out of the funds' of the Authority as a public body, which is what the plain language of Section 2(5) of the [PWA] requires." *Id.* at 1123. In doing so, the Commonwealth Court "reject[ed] the Board's reasoning that the Project is covered by the [PWA] because 'Ursinus would not have had this funding stream available but for the existence of the Authority and its coordination of the funding through its statutory powers as a public

body.'"  *Id.* (quoting O.R., Item No. 1, Board's Decision dated 6/25/2021, at 19.)  The Commonwealth Court reasoned that Section 2(5) of the PWA does not include a "but for" test and, instead, is clear and unambiguous in requiring "that the work be paid for 'out of the funds' of a public body."  *Id.*  As such, the Commonwealth Court opined that it "must give effect to the words of the statute."  *Id.*  The Commonwealth Court added that, "because Ursinus, and not the Authority, bore the risk for repaying the bonds, the economic reality of this transaction reveals that the Project is not public work subject to the [PWA]."  *Id.* at 1123-24.

The Commonwealth Court further concluded that the Board erred in relying upon *Penn National II* to support its conclusion that the PWA covered the Project, distinguished the matter now before the court from the circumstances present in *Lycoming County* and *Borough of Ebensburg*, and found the transaction at issue here to be similar to the transaction at issue in *Willman*, where this Court "held that the . . . Hospital's construction project was not subject to competitive bidding under the MAA[ of 1945], as 'construction work made by any authority,' when the project was privately funded on private property and managed by private parties."  *Id.* at 1124-25 (quoting *Willman*, 479 A.2d at 456.)  The Commonwealth Court explained that, "[l]ike the Authority's role here, the authority's role in *Willman* was limited to providing a financing vehicle by issuing bonds to assist in the construction of a private project, in which the authority did not disburse or hold project funds, assigned all funds to the trustee, and bore no risks or obligations for the bonds."  *Id.* at 1125.  Accordingly, the Commonwealth Court reversed the Board's order and held that the PWA did not cover the Project.

## II.  ISSUE

This Court granted discretionary review to decide the following issue, as stated by IBEW:

> Whether the Commonwealth Court's [o]rder concluding that a construction project that was funded by the issuance and sale of tax-exempt municipal bonds by a public authority did not constitute "public works" severely undermines the purposes of the [PWA], and will allow employers to circumvent the requirements of the [PWA], thus undermining Pennsylvania public policy?

*Ursinus College v. Prevailing Wage Appeals Bd.*, 293 A.3d 248 (Pa. 2023) (per curiam) (first alteration in original).[16]

## III.  ANALYSIS

### a.  Parties' Arguments[17]

IBEW argues that precedent from this Court and the Commonwealth Court has consistently applied a broad interpretation of the phrase "funds of a public body" as used in Section 2(5) of the PWA to effectuate the PWA's purpose of protecting workers from being paid substandard wages on public projects. (IBEW's Brief at 12-15 (discussing *Penn National I and II*, *Lycoming County*, *Borough of Ebensburg*, and *500 James Hance*

---

[16] "Our standard of review is limited to determining whether the Board's findings are supported by substantial evidence, whether an error of law was committed, or whether any constitutional rights were violated." *Penn National I*, 715 A.2d at 1071 n.3 (quoting 2 Pa. C.S. § 704).  Insofar as the issue raised implicates a question of law, "our standard of review is *de novo* and our scope of review is plenary." *Shrom v. Pa. Underground Storage Tank Indemnification Bd.*, 292 A.3d 894, 907 (Pa. 2023).

[17] The Bureau, the Board, and the Authority did not file a brief in this Court.  The following entities filed *amici curiae* briefs on behalf of Ursinus and in support of affirmance of the Commonwealth Court's decision:  (1) Bucknell University, Cedar Crest College, Dickinson College, Elizabethtown College, Lebanon Valley College, Saint Joseph's University, Villanova University, and Wilkes University; (2) The Keystone Chapter of Associated Builders and Contractors, Inc.; (3) the Pennsylvania Chamber of Business and Industry, Pennsylvania Council of General Contractors, LeadingAge PA, Pennsylvania Waste Industries Association, and Pennsylvania Municipal Authorities Association; and (4) the Pennsylvania Economic Development Association and the Chester County Industrial Development Authority.

*Court*).)  IBEW contends that, in this case, the Commonwealth Court erred by ignoring that body of law and, instead, basing its decision solely on *Willman*, a case that did not interpret Section 2(5) of the PWA, "[i]n an apparently result-oriented bit of 'decision shopping.'"  (*Id.* at 15-16.)  IBEW explains that the legislative intent and policy goals behind the MAA and the PWA are clearly distinct, with the MAA protecting taxpayers and the PWA protecting workers.  IBEW further asserts that the "public/private" distinction is "lesser" relative to the MAA than the PWA because taxpayers, "through the polls, can criticize poor spending habits by ousting politicians who use taxpayer dollars unwisely," whereas workers "are generally powerless to remedy being underpaid on public works projects," particularly at the time such abuses occur.  (*Id.* at 17 & n.1.)  IBEW contends that the Commonwealth Court was blind to these differences between the MAA and PWA "and will reward the fiction it accepted to undermine the reality of the transaction in this matter," which demonstrates that the Project was indeed publicly funded.  (*Id.* at 18.)  IBEW argues that, if left to stand, the decision below will only encourage the proliferation of financial arrangements similar to the one at issue here, "and construction projects that are being financed by public mon[ies]—mon[ies] that would not exist but for the full faith and credit of public bodies"—will be exempt from the PWA's coverage "simply because a private broker . . . stands between the public body and the private end user."  (*Id.* at 19.)  As such, IBEW argues that the Commonwealth Court opened a loophole that will serve to make the PWA virtually moot and result in workers suffering in direct contravention of the public policy behind the PWA.

Ursinus counters that the PWA's definition of "public work" is clear and unambiguous and that the Project does not meet that definition because it was not "paid for in whole or in part out of the funds of a public body."  43 P.S. § 165-2(5).  Ursinus contends that, instead, the Project was paid for out of private investor funds resulting from

payment of the bond purchase price. Ursinus emphasizes that neither those funds (*i.e.*, the bond proceeds) nor the debt service payments made by Ursinus ever entered, rested in, or otherwise flowed through the Authority's coffers. Focusing on "the timing and relationship of the financing documents" at issue, (Ursinus' Brief at 16), Ursinus also highlights that the Authority at no time had rights in or to the bond proceeds and did not have the right to receive loan payments from Ursinus to service the debt. In sum, Ursinus argues that, "[w]hile the revenue bonds issued by the Authority were part of the financing vehicle by which Project funds were generated," that fact does not transform the privately funded Project into a "public work." (*Id.* at 21.)

Ursinus also disputes any suggestion by IBEW that the Authority misused the concept of "full faith and credit" or remains obligated on the revenue bonds under that concept. (Ursinus' Brief at 26.) Ursinus notes that the transaction documents provide that the bonds do not pledge the full faith and credit of any government, that Ursinus is obligated to repay the bond debt using its own revenue, and that the Authority's assignment to the Trustee was absolute and without recourse against the Authority. Ursinus adds that the Authority has no taxing power and that "[t]he economic reality of the transaction is that there was no cost, no liability[,] and no risk to the Authority and the taxpayers." (*Id.* at 28.) Emphasizing that project developers and other entities do not use conduit financing for purposes of artifice, Ursinus submits that IBEW ignores that the Authority exists for the very purpose of providing "economic development services, including conduit financing for projects like the" Project pursuant to the MAA. (*Id.* at 29-30.)

Ursinus further contends that the Commonwealth Court's decision below is consistent with the plain language of the PWA and prior precedent interpreting that language, and it does not impact the public policy underlying the PWA or create a

loophole as alleged by IBEW. According to Ursinus, this case presents "no reason for this Court to reinterpret or rewrite the plain language of the [PWA]" and that, because the statutory language is clear and unambiguous, IBEW's arguments based upon legislative intent are irrelevant. (Ursinus' Brief at 11, 13.) Ursinus adds that, insofar as IBEW seeks application of a "but for" standard focusing merely on a public body's involvement in the financial transaction at issue, such an interpretation would be contrary to, and constitute an expansion of, the PWA's plain language. Ursinus claims that it is for the General Assembly to determine if the PWA's applicability should be substantially expanded in this manner through amendment to the PWA or MAA. Ursinus also contends that IBEW's position is contrary to established case law, which has interpreted the statutory language in a manner that distinguishes between funds that rest in public coffers and "funds that never rested [in], passed through, or otherwise touched the public coffers." (*Id.* at 12-13.) Indeed, Ursinus submits that the Commonwealth Court thoroughly and appropriately discussed the relevant cases, including *Willman*, and correctly distinguished the decisions upon which IBEW relies in support of its position on factual grounds. Ursinus further notes that numerous decisions from other jurisdictions have determined that financing arrangements similar to the one at issue here do not render projects subject to their respective prevailing wage laws.[18]

b. Discussion

We are guided in our analysis by the Statutory Construction Act of 1972 (Statutory Construction Act), 1 Pa. C.S. §§ 1501-1991, which provides that the object of all statutory interpretation "is to ascertain and effectuate the intention of the General Assembly." 1 Pa. C.S. § 1921(a). Generally, the plain language of the statute "provides the best

---

[18] Ursinus additionally argues that, if this Court holds that the PWA does cover the Project, our holding should apply purely prospectively. Given our conclusion that the PWA does not cover the Project, we need not address this issue.

indication of legislative intent." *Miller v. Cnty. of Centre*, 173 A.3d 1162, 1168 (Pa. 2017). If the statutory language is clear and unambiguous in setting forth the intent of the General Assembly, then "we cannot disregard the letter of the statute under the pretext of pursuing its spirit." *Fletcher v. Pa. Prop. & Cas. Ins. Guar. Ass'n*, 985 A.2d 678, 684 (Pa. 2009) (citing 1 Pa. C.S. § 1921(b)). In this vein, "we should not insert words into [a statute] that are plainly not there." *Frazier v. Workers' Comp. Appeal Bd. (Bayada Nurses, Inc.)*, 52 A.3d 241, 245 (Pa. 2012). When the statutory language is ambiguous, however, we may ascertain the General Assembly's intent by considering the factors set forth in Section 1921(c) of the Statutory Construction Act, 1 Pa. C.S. § 1921(c), and other rules of statutory construction. *See Pa. Sch. Bds. Ass'n, Inc. v. Pub. Sch. Emps. Ret. Bd.*, 863 A.2d 432, 436 (Pa. 2004) (observing that "other interpretative rules of statutory construction are to be utilized only where the statute at issue is ambiguous"). Additionally, "[w]ords and phrases shall be construed according to rules of grammar and according to their common and approved usage," though "technical words and phrases and such others as have acquired a peculiar and appropriate meaning or are defined in [the Statutory Construction Act] shall be construed according to such peculiar and appropriate meaning or definition." 1 Pa. C.S. § 1903(a). "We also presume that 'the General Assembly does not intend a result that is absurd, impossible of execution or unreasonable,' and that 'the General Assembly intends the entire statute to be effective and certain.'" *Berner v. Montour Twp. Zoning Hearing Bd.*, 217 A.3d 238, 245 (Pa. 2019) (quoting 1 Pa. C.S. § 1922(1)-(2)).

This matter requires us to interpret Section 2(5) of the PWA, which defines "[p]ublic work," in relevant part, to mean certain work that is "paid for in whole or in part out of the funds of a public body." 43 P.S. § 165-2(5). Focusing on the words "paid," "out," "of," "funds," and "public body," we observe that neither the PWA nor Section 1991 of the

Statutory Construction Act provide a default definition for any of the terms save for "public body," discussed below. Thus, in an effort to interpret the meaning of the remaining words "according to their common and approved usage," we turn to "an examination of dictionary definitions." *Commonwealth v. Gamby*, 283 A.3d 298, 307 (Pa. 2022) (explaining that, "[t]o discern the legislative meaning of words and phrases, our Court has on numerous occasions engaged in an examination of dictionary definitions"). The word "paid" is most pertinently defined as "receiving pay;" "marked by the reception of pay esp. in an advance lump sum;" or "that has been or will be paid for." Webster's Third New International Dictionary 1620 (1993). The word "out" is defined as "in a direction away from a particular point or place." *Id.* at 1600. The word "of" is "used as a function word to indicate the place or thing from which anything moves, comes, goes, or is directed or impelled" or is "used as a function word indicating a possessive relationship." *Id.* at 1565. The word "funds" is defined as "available pecuniary resources ordinarily including cash and negotiable paper that can be converted to cash at any time without loss." *Id.* at 921; *see also Funds*, Black's Law Dictionary 816 (11th ed. 2019) (defining "funds" as "[m]oney or other assets, such as stocks, bonds, or working capital, available to pay debts, expenses, and the like"). Finally, as alluded to above, the PWA defines the term "public body" to "mean[] the Commonwealth of Pennsylvania, any of its political subdivisions, any authority created by the General Assembly of the Commonwealth of Pennsylvania and any instrumentality or agency of the Commonwealth of Pennsylvania." Section 2(4) of the PWA, 43 P.S. § 165-2(4).

Based on the foregoing definitions, a plain reading of the phrase "paid for in whole or in part out of the funds of a public body" requires the work to be marked by the receipt of payment, in whole or in part, from available pecuniary resources from or possessed by "the Commonwealth of Pennsylvania, any of its political subdivisions, any authority

created by the General Assembly of the Commonwealth of Pennsylvania and any instrumentality or agency of the Commonwealth of Pennsylvania." *Id.* Further, upon review, we find nothing in the plain reading of the statutory language to be unclear or ambiguous, and, as such, we do not resort to other principles of statutory construction to elicit the meaning of the phrase. *Pa. Sch. Bds. Ass'n*, 863 A.2d at 436 (explaining that "the best indication of legislative intent is the plain language of a statute" and that "[c]ourts may resort to other considerations to divine legislative intent only when the words of the statute are not explicit"); *Zane v. Friends Hosp.*, 836 A.2d 25, 31 (Pa. 2003) ("Only after the words of the statute are found to be unclear or ambiguous should a reviewing court further engage in an attempt to ascertain the intent of the Legislature through use of the various tools provided in the Statutory Construction Act.").

We, therefore, turn to the application of that definition to the instant matter. In doing so, however, we reiterate that "the labels appended to transactional documents do not exclusively determine the applicability of regulation under the [PWA], as the potential for evasion and artifice is too great. Rather, as in other settings the economic reality of the transaction should control," with the allocation of risk being a prominent consideration in the analysis. *500 James Hance Ct.*, 33 A.3d at 572-73. Here, in view of the plain language of the statute and the economic reality of the transaction at issue, we conclude that the Project work was not marked by the receipt of payment, in whole or in part, from available pecuniary resources from or possessed by the Authority. As described above, after assigning the Loan Agreement to the Trustee, the Authority sold bonds to a private Underwriter, which paid the purchase price of the bonds with private monies directly to the private Trustee, which deposited those monies into the Project Fund. The Trustee, in turn, disbursed those private monies from the Project Fund to Ursinus, a private nonprofit college, or others designated by Ursinus for Project costs. Moreover, Ursinus alone

repaid the bond debt from its own revenue, again directly to the Trustee, which deposited those funds into the Bond Fund and paid the bondholders from that Bond Fund. According to the evidence of record, at no point did either the monies used to pay the Project costs or the monies used to service the bond debt ever enter, rest in, or otherwise flow through the Authority's coffers. Moreover, no Authority or taxpayer funds were used to secure the bonds; neither the Authority nor taxpayers bore any risk or liability relative to the bonds.[19] In short, the Project work was marked by the receipt of payment, in whole or in part, from the available pecuniary resources from or possessed by the private Trustee (not the Authority)—*i.e.*, the private bond proceeds generated from the sale of the Authority's bonds and deposited in the Project Fund. As such, the Authority simply served as a conduit for financing the Project, a private endeavor.

Turning to IBEW's arguments on appeal, those arguments fail in view of the plain meaning of the statute. Specifically, to the extent that IBEW advocates for application of a standard utilizing a "but for" test and/or requiring mere involvement of a public body—*i.e.*, but for the Authority's involvement in the transaction, the Project could not have occurred—we agree with the Commonwealth Court that such a standard is not supported by the statute's clear requirement that the project be "paid for in whole or in part out of the funds of a public body." 43 P.S. § 165-2(5). Rather, requiring a "but for" test or mere involvement of the public body would require adding or otherwise modifying statutory language to expand the PWA's coverage beyond its plain terms. This we cannot do. *See*

---

[19] To the extent that IBEW suggests that the Authority remains obligated on the bonds under the concept of "full faith and credit" or that the "full faith and credit" of the Authority has been misused, IBEW's position is belied by the record. As our discussion of the transaction documents above indicates, the bonds are a limited obligation of the Authority, do not pledge the full faith and credit of the Authority or any government, and are payable solely from the loan payments made by Ursinus. The bonds provided that the Authority has no taxing power, and no taxes collected by any government entity are at risk of being transferred to bondholders in repayment of the debt. Ursinus, not the Authority, is obligated to repay the bonds.

*Shafer Elec. & Const. v. Mantia*, 96 A.3d 989, 994 (Pa. 2014) (providing that "it is not for the courts to add, by interpretation, to a statute, a requirement which the legislature did not see fit to include" (quoting *Commonwealth v. Rieck Inv. Corp.*, 213 A.2d 277, 282 (Pa. 1965))).

We also reject IBEW's assignments of error that IBEW premises on public policy grounds. To the extent that IBEW submits that we should broadly interpret the statutory language at issue to effectuate the PWA's purpose of protecting workers on public works from substandard wages, we emphasize that, "[w]hen the words of a statute are clear and free from all ambiguity," as we have found here, "the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa. C.S. § 1921(b); *see also Barnard v. Travelers Home & Marine Ins. Co.*, 216 A.3d 1045, 1054 (Pa. 2019) (explaining that "invocations of, and arguments about, public policy cannot override the plain language of" statutory provision at issue or "contravene the plain meaning of the term" used therein). In this same vein, we decline to interpret the statutory language in the manner IBEW suggests based upon its contention that the contrary holding reached by the Commonwealth Court and this Court creates a "loophole" to be exploited by entities looking to evade compliance with the PWA's requirements. Setting aside that IBEW points to no evidence of record demonstrating such nefarious activity here,[20] and even accepting that our interpretation will yield such a result, it is not this Court's role to "re-construe [statutory language] because we believe an alternative interpretation would address certain unintended consequences of the law." *Commonwealth, Off. of Governor v. Donahue*, 98 A.3d 1223, 1240 (Pa. 2014). Rather, "[w]e leave the task of rectifying

---

[20] To the contrary, it appears that the use of financing mechanisms like the one at issue here is not motivated by a desire to avoid compliance with the PWA but, instead, stems from the benefits arising out of such arrangements relative to their favorable tax implications and the manner in which they work to spur projects that ultimately benefit the public by facilitating low-cost financing.

perceived deficiencies in the statutory scheme . . . to the legislature." *Id.*; *see also Penn National I*, 715 A.2d at 1074 (noting that "legislature could have crafted the definition of 'public work' to include work that was not paid for in whole or in part with funds of a public body, but instead it chose to limit prevailing wage to be paid only on that work which satisfies the four[-]element definition of 'public work'").

Moreover, we likewise reject IBEW's contention that the Commonwealth Court rendered a conclusion, consistent with the holding we reach today, that contravenes prior precedent. Rather, the Commonwealth Court correctly observed that the case law upon which IBEW relies is distinguishable on factual grounds. Specifically, *Penn National II* does not govern this matter because, as noted, *Penn National II* hinged on the fact that public taxing bodies actually collected and held tax increment dollars before paying those monies over to the trustee for use in servicing the tax increment bond debt. *Penn National II*, 808 A.2d at 889. Here, Ursinus made loan payments directly to the Trustee for use in servicing the bond debt; the Authority did not collect or hold those payments in its coffers at any time between Ursinus making those payments and the Trustee receiving those payments, as was the case with the public taxing bodies in *Penn National II*. *Cf. id.* (finding it significant that "the statutory financing at issue [in *Penn National II* was] not a tax abatement, where the taxing authority agrees to forego receiving property taxes on a certain property for a certain time" but that, "[t]o the contrary, the tax money is actually collected by the taxing bodies, and, in turn, th[o]se dollars are used to pay off the tax increment bonds"). Furthermore, we agree that the Commonwealth Court's decision in *Lycoming County* is inapplicable, because that case involved not only a public entity's loan of start-up costs and bond proceeds for which the public entity remained liable and lease of the land for the project to the nonprofit, but also a finding that the public entity was the alter-ego of the nonprofit. As explained herein, the Authority did not loan any

funds to Ursinus for which the Authority remained liable, did not lease any land for the Project to Ursinus, and is not the alter-ego of Ursinus. Finally, this matter is distinguishable from *Borough of Ebensburg* on the grounds that, unlike the public body in that case, which fronted construction costs and later received reimbursement through assessments against private landowners, the Authority itself did not pay for any portion of the Project—up front or otherwise—nor did it accept funds as reimbursement from Ursinus. Based on the foregoing, *Penn National II*, *Lycoming County*, and *Ebensburg* do not require a result contrary to that which we reach today.

Finally, we find no reversible error in the Commonwealth Court's reliance on *Willman*, which was not to the exclusion of other applicable law as suggested by IBEW. Indeed, we agree that *Willman* provides further support for the conclusion that the Project is not subject to the PWA's prevailing wage requirements given that the decision concerned a similar financial arrangement and held that the public bidding requirement of the MAA of 1945 did not apply because the authority's role in that financial arrangement was limited merely to "serv[ing] as a financing conduit for an entirely private project." *Willman*, 479 A.2d at 456 (observing that conduit financing arrangement did "not involve the use or risk of public funds or public credit," that case concerned "private undertaking at no cost to the taxpayers," and that project was "private project, backed by private property and private funds and [wa]s to be managed and constructed by private parties"). To the extent IBEW argues against reliance upon *Willman* based upon policy differences between the MAA and PWA, we reiterate that such policy arguments do not bear upon our analysis in light of the plain language of the PWA. Moreover, while the PWA is intended to protect workmen employed on public works by ensuring that they receive prevailing minimum wages, similar to our Court's analysis in *Willman*, we observe that the reason for requiring prevailing wages does not exist relative to the Project, which is a

private undertaking. *Id.* (providing that "reasons for open competitive bids do not exist" because project at issue was private). The General Assembly could have written Section 2(5) of the PWA to encompass projects for which an authority serves as a financing conduit, but it did not. *See id.* (explaining that "legislature could have, but did not, state in Section 10 of the [MAA of 1945] that all projects *financed* by an authority are subject to public competitive bidding requirements" (emphasis in original) (quoting *Willman v. Children's Hosp. of Pittsburgh*, 459 A.2d 855, 858-59 (Pa. Cmwlth. 1983), *aff'd*, 479 A.2d 452 (Pa. 1984))). As such, we give effect to the language of the PWA as clearly and unambiguously written. *Crown Castle NG East LLC v. Pa. Pub. Util. Comm'n*, 234 A.3d 665, 688 (Pa. 2020) ("When statutory language is clear and unambiguous, courts must give effect to the words of the statute and must not disregard the text to implement its objective.").

## IV. CONCLUSION

We hold that the Project falls outside of the PWA's purview, as it was not "paid for in whole or in part out of the funds of a public body" by virtue of the Authority's role in providing conduit financing for the Project under the circumstances outlined herein. *See* 43 P.S. § 165-2(5). Rather, the economic reality of the instant financial transaction reveals that the Project was instead paid for out of private funds, which were generated by the Authority's exercise of its statutory ability to issue bonds. Moreover, the Authority did not hold or disburse those funds or the bond debt service payments at any point, nor did the Authority bear any risk or liability with respect to repayment of the bonds. Accordingly, for the reasons stated, we affirm the order of the Commonwealth Court.

Chief Justice Todd and Justices Donohue, Wecht and Mundy join the opinion.

Justice Dougherty did not participate in the consideration or decision of this matter.